**In re JOINT EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.**

**This Document Relates To: Lee Lewis, CV–87–5189 (S.D.N.Y.) Martin McPadden, CV–90–3473 (S.D.N.Y.) PH–101.**

**No. NYAL–PH–8888.**

United States District Court, E. and S.D. New York.

July 28, 1992.

See also 798 F.Supp. 925.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

The two cases treated in this opinion represent what remains of a trial that began with 48 plaintiffs and multiple direct and third-party defendants. This opinion sets forth the basis for the Court's reduction of the jury verdicts in those two cases to final judgments, which are filed simultaneously with this opinion.

Faced with a torrent of personal injury and wrongful death cases stemming from exposure to asbestos, the Chief Judges of the Court of Appeals for the Second Circuit and of the District Courts for the Eastern and Southern Districts of New York transferred all such cases filed in either district to the undersigned. In order to facilitate settlements and trial, those cases, which numbered in the thousands, were thereafter subdivided by the location in which plaintiffs suffered primary exposure.

Forty-eight cases of primary exposure due to the construction or repair of New York state powerhouses, were set down for a reverse bifurcated trial which commenced on April 1, 1991. With the assistance of a special master, all but two of these cases settled. Two went to verdict.

The parties were fortunate to have tried their cases before an astonishingly patient and careful jury. At the end of Phase I of the trial, the jury returned a verdict finding the trial plaintiffs had suffered substantial damages. After settlement, only two defendants—John Crane–Houdaille in *McPadden* and Keene Corporation in *Lewis*—remained to hear the jury render a liability verdict against them in Phase II.

■ In diversity cases such as these, the "method of calculating the recoverable damages is a question of state law." *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 n. 5 (2d Cir.1984). Thus New York law controls the issues now before the Court.

■ Under New York law, the verdict does not speak for itself. New York law initially requires the court to apply to the verdict "any applicable rules of law, including set-offs, credits, comparative negligence . . . additures, and remittiturs, in calculating the respective amounts of past and future damages claimants are entitled to recover and defendants are obligated to pay." CPLR § 5041(a).

Important differences exist between the two remaining cases, and those differences affect the molding exercise. Foremost among those differences, the *McPadden* case involves Article 16 of New York's Civil Practice Law and Rules ("CPLR"), which limits the plaintiff's joint and several recovery for non-economic losses, whereas the *Lewis* case does not. Because these

cases present important and novel questions of law, I discuss them at some length.

## McPADDEN

The jury found that the McPadden family had suffered $5,917,781.85 in total damages. The jury also found John Crane–Houdaille's equitable share of those damages to be 10%.

The verdict form returned by the jury read as follows:

| Type | Jury Award |
| --- | --- |
| Past lost income | $ 565,981.85 |
| Consortium/economic | 127,300.00 |
| Consortium/non-economic | 400,000.00 |
| Past pecuniary loss | 17,500.00 |
| Future pecuniary loss | 294,000.00 |
| Funeral expenses | 4,500.00 |
| Lost services | 8,500.00 |
| Pain and suffering | 4,500,000.00 |

For reasons stated in an opinion denying defendants' motions for post-verdict relief, also filed today, a clerical error regarding the $565,981.85 award for "past lost income" has been corrected by assigning that sum to future pecuniary losses to survivors stretching over a period of 25.7 years. The $294,000 already attributed to future pecuniary losses represents the economic value of decedent's nurture, care, and guidance to his survivors, whereas the $565,981.85 represents their lost stream of income. *See Shu–Tao Lin*, 742 F.2d 45; *Gonzalez v. New York City Housing Authority*, 77 N.Y.2d 663, 569 N.Y.S.2d 915, 572 N.E.2d 598 (1991).

Molding this verdict into a judgment requires a number of steps. First, plaintiff argues that she is entitled to an adjustment to bring the award to present value. Second, any collateral source payments must be subtracted. Third, the defendant must receive appropriate set-offs for the shares of settling joint tortfeasors. Fourth, Article 16 must be applied. Fifth, a dollar judgment must be calculated. Finally, part of the judgment must be adjusted to structure the payment of future damages.

### A. *Converting Damage Awards to Present Value*

Plaintiff's counsel argues that certain kinds of damages—economic losses—should be "increased to present value" at a rate of 6% from the time of the injury to the date of the Phase I verdict and that all damages should bear interest at a 9% rate from the date of the Phase I verdict to the entry of judgment. Defendant's counsel argues that the only increase available to the plaintiff is 9% interest from the date of the Phase II verdict, which established Crane's liability.

Both parties misapply New York law. Crane is correct that plaintiff has not pointed to any authority supporting an increase to present value of the damage awards. Crane fails to acknowledge, however, that New York law entitles plaintiff to pre-verdict interest on certain elements of the damages. *See* N.Y. E.P.T.L. § 5–4.3(a).

For his part, plaintiff's counsel does not seek pre-verdict interest but, instead, an increase to present value at a rate of 6% compounded annually, a figure that presumably represents the inflation rate. Plaintiff contends that the parties stipulated to such an increase.

Plaintiff errs in his description of what the parties agreed to. Discussion of this issue took place during Phase I of the trial. Plaintiff's counsel argued that all awards for economic losses should be inflated to present value and that wrongful death awards should earn pre-verdict interest in addition to an increase for inflation. Tr. 4048–53, May 17, 1991. Later, the Court stated, "I'm going to assume that all parties are resolved that if some court someday rules that past losses should be inflated to—should be increased to take into account inflation, the way to do it would be simply to use the cost of living index." Tr. at 5792, June 6, 1991. The Court also suggested that it act as the finder of fact with regard to any such increase and termed this "a perfectly reasonable proposal ... which has been accepted by everyone," except one defendant no longer active in this litigation. Tr. at 5792–93, June 6, 1991. Due to this persistent objection, during which the objecting defendant called into question the existence of any stipulation among the parties, the Court finally proposed holding a "hearing" on "what effect ... the passage of time has [had] on

the losses . . ., if any, that the plaintiffs are entitled to for the period in the past." *Id.* at 5797. All parties acceded to this plan. Tr. at 5936, June 10, 1991.

■ The Court eventually instructed the jury to award past damages "in past dollars without consideration for any inflation that may have occurred from the past until today since after the trial I will make an appropriate adjustment to past damages to compensate for any effects of inflation on those losses." Tr. at 3604, July 29, 1991. The parties had previously agreed to this language at the charge conference. Tr. at 6201, June 17, 1991.

From the foregoing, it appears that the "stipulation," such as it is, simply allows the Court to make findings with regard to the proper amount of increase for inflation, if any. It does not obligate the Court to increase awards at a particular rate or even to increase them at all.

The immediate question, then, is whether such an increase is appropriate, and if so, what the quantum of that increase ought to be.

■ No New York authority supports an increase to present value. Accordingly, such an adjustment is not appropriate in this case.[1] For wrongful death damages, however, plaintiff is entitled to pre-verdict interest, *see* EPTL § 5–4.3; *Milbrandt v. A.P. Green Refractories Co.,* 79 N.Y.2d 26, 580 N.Y.S.2d 147, 588 N.E.2d 45 (1992), which will effectively increase a portion of the award to present value or an amount approximate to it.[2] That law expressly provides for interest from the date of the decedent's death to the verdict on pecuniary losses to survivors, including funeral and medical expenses. EPTL § 5–4.3. The amount of interest is added to these elements of damages and comprises a part of the "principal sum" awarded. *Id.* Pre-verdict interest on such an award accrues at the "statutory rate" set forth in CPLR § 5004. *Shu–Tao Lin,* 742 F.2d at 51. *Cf. Milbrandt,* 580 N.Y.S.2d at 152 n. 5, 588 N.E.2d at 50 n. 5 (1992) (CPLR § 5001(b) applies to wrongful death actions). CPLR § 5004 establishes the rate of interest as 9%. CPLR § 5004.

■ Until recently, plaintiff might have had a persuasive argument that she was entitled to pre-verdict interest "as a matter of right" pursuant to CPLR § 5001 on all economic injuries.[3] *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 693 (2d Cir. 1983); *see also Hilford Chem. Corp. v. Ricoh Electronics, Inc.,* 875 F.2d 32, 39 (2d Cir.1989); *Lewis v. S.L. & E., Inc.,* 831 F.2d 37, 40 (2d Cir.1987). However, current law in this circuit is to the contrary. *See In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 851 (2d Cir.1992).

At common law, pre-verdict interest was not available to a successful party in a negligence action. *See Mallis,* 717 F.2d at 694; *Delulio v. 320–57 Corp.,* 99 A.D.2d 253, 472 N.Y.S.2d 379, 381 (1st Dept.1984). However, subsequently enacted statutes have relaxed this rule. One such statute is

---

1. I note that the method proposed by the plaintiff—a 6% increase, compounded annually—is incorrect in all events. The rate of past inflation, unlike anticipated future inflation, is an historical fact admitting of actual calculation. A standard measure of inflation, and one wholly appropriate in the instant case, is the change in the consumer price index (CPI). To inflate a past sum to present value, it is only necessary to take the present value of the CPI and divide it by the value of the CPI at the time the damages were incurred, multiply the resulting figure by the amount of those past damages to know the inflated amount. Plaintiff's method disregards the CPI. An additional error in plaintiff's method is that, when calculating inflation, unlike calculating interest, annual compounding is inappropriate.

2. The fact that the statutory rate set forth in § 5004 has changed over time demonstrates its sensitivity to inflation; had it been designed to be an inflation-free rate, it would have remained constant at a real rate of return. *Cf. Complaint of Connecticut National Bank,* 928 F.2d 39 (2d Cir.1991) (inflation-free discount rate remains fixed at 1–3%, whereas inflation-sensitive discount rate varies from case to case). Thus, statutory interest may be said to be a form of increasing an award to present value.

3. It is clear that awards for non-economic losses are not entitled to pre-verdict interest. *See Chase v. New York City Transit Authority,* 121 A.D.2d 425, 503 N.Y.S.2d 123 (2d Dept.1986); *Sleeman v. Reifenstein,* 90 A.D.2d 996, 456 N.Y.S.2d 597 (4th Dept.1982). The plaintiff, in fact, requests no adjustment for these damages.

EPTL § 5–4.3. Another is CPLR § 5001 which, despite the familiar rule of construction requiring a court to interpret narrowly statutes in derogation of the common law, see *Young v. Robertshaw Controls Co.*, 104 A.D.2d 84, 481 N.Y.S.2d 891, 894 (3d Dept.1984), might be argued to apply to a case such as this.

■ While traditionally "pre-verdict interest is not allowable on a verdict for personal injuries," *Gillespie v. Great Atlantic & Pacific Tea Co.*, 26 A.D.2d 953, 276 N.Y.S.2d 372 (2d Dept.1966), *modified on other grounds*, 21 N.Y.2d 823, 288 N.Y.S.2d 907, 235 N.E.2d 911 (1968), section 5001 provides for recovery of pre-verdict interest "upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." CPLR § 5001(a). Thus, where damages attempt to compensate for interference with a property right, pre-verdict interest is available.[4] This is true even where the loss or degradation of property is caused by tortious conduct. *See, e.g., Mallis v. Bankers Trust Co.*, 717 F.2d at 694 (pre-verdict interest on common law fraud and negligent misrepresentation).

■ Prior to the recent *Brooklyn Navy Yard* decision, plaintiff might have thus argued that the economic damages awarded in this case all constitute "property" for the purposes of calculating pre-verdict interest. In *Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987), a case involving a negligently caused death, the Second Circuit held that lost earnings are properly the subject of pre-verdict interest. *Id.* at 561. The Second Circuit relied on *Loeb v. Teitelbaum*, 112 Misc.2d 1039, 448 N.Y.S.2d 391 (N.Y.Civ.Ct.1982), which stated, "It is not the theory of the claim that controls but whether the claim was the result of a financial or property loss." *Id.* 448 N.Y.S.2d at 393.

Similarly, in *Mallis v. Bankers Trust Co.*, 717 F.2d at 695, the Second Circuit held that the loss of money given as a loan fell within the definition of property under CPLR § 5001. The court found such a result "consistent with the scope and intent of § 5001(a), especially in light of New York's prevailing policy, interwoven into § 5001, that '[i]nterest must be added [in actions where persons are deprived of the use of money] if we are to make the plaintiff whole.'" *Id.* (quoting *Prager v. New Jersey Fidelity & Plate Glass Ins. Co.*, 245 N.Y. 1, 5–6, 156 N.E. 76 (1927) (Cardozo, C.J.)) (brackets in original).

The New York Court of Appeals' recent *Milbrandt* opinion lends support to this conclusion. The court not only endorsed *Woodling* but went so far as to state that the "financial expectancies constituting the basis of recovery in wrongful death action are property rights inuring to the survivors of the decedent." *Milbrandt*, 580 N.Y.S.2d at 152 n. 5, 588 N.E.2d at 50 n. 5.

The very same type of "financial expectancies," might be argued, appears to constitute the "basis of recovery" for all economic losses claimed here, whether termed "personal injury" or "wrongful death." Like pecuniary losses in wrongful death and lost earnings in survival actions, awards for both lost services and economic loss of consortium compensate plaintiffs for deprivation of economically valuable services which they would have enjoyed but for the injury to the decedent. Indeed, one element of damages considered a pecuniary loss under the wrongful death statute, medical expenses, is also routinely available in personal injury actions. Thus, making the availability of pre-verdict interest turn on a distinction between economic personal injury damages and wrongful death damages appears artificial.

Artificial or not, this is the distinction that the Court of Appeals for this circuit has recently held that New York law requires this Court to draw. In *In re Brooklyn Navy Yard, supra*, the Second Circuit held that § 5001 did not permit an award of pre-verdict interest on any damages, including economic damages, in a survival action. Accordingly, the only pre-verdict interest

---

**4.** When interest accrues pursuant to CPLR § 5001, it does so at a rate of 9% per annum as fixed by CPLR § 5004. *See Delulio*, 472 N.Y.S.2d at 382.

available here is on pre-verdict pecuniary losses arising from the wrongful death cause of action.

■ The Court of Appeals also ruled that this allowable pre-verdict interest must be calculated before other adjustments to the verdict in order to effectuate EPTL § 5–4.3(a)'s requirement that interest "shall be added to and be a part of the total sum awarded." *Brooklyn Navy Yard* at 852. The procedure for calculating the amount of interest is set out in CPLR § 5001(b). *Milbrandt,* 580 N.Y.S.2d at 152 at n. 5, 588 N.E.2d at 50 n. 5. That statute provides:

"[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."

CPLR § 5001(b).

The funeral expenses are readily "ascertainable"—they date from the time of death. The date from which that element of damages begins to accrue interest is thus October 6, 1990. Past pecuniary losses, however, "are ongoing and spread over the period from the date of decedent's death to the date of the verdict [and thus] may be viewed as resulting from a series of discrete losses occurring after decedent's death." *Milbrandt,* 580 N.Y.S.2d at 152, 588 N.E.2d at 50. As the losses represented by the award for pecuniary damages—services, nurture, care, and guidance—cannot be fixed at one particular time, the Court will calculate pre-verdict interest beginning from the "reasonable intermediate date" of June 24, 1991.[5]

■ In arriving at this intermediate date, the Court has chosen the jury's verdict in Phase II as the proper end date for pre-verdict interest. Judicial interpretation of New York statutes clearly provides that

in a bifurcated trial post-verdict, pre-judgment interest begins to run from the date when the jury determines liability, not damages. *See Gunnarson v. State,* 70 N.Y.2d 923, 524 N.Y.S.2d 396, 397, 519 N.E.2d 307 (1987). While no New York case applies this rule to a *reverse* bifurcated trial, the rationale behind terming the date of the liability the date of the "verdict" for purposes of calculating interest carries equal force:

" 'Interest is the ordinary incident for the nonpayment or delay in payment of a principal obligation and is recoverable as just compensation for the detention of money due.... It is given as damages for delay in payment of the principal obligation, and is said to be an invariable legal incident of the principal debt whenever a debtor knows precisely what he is to pay and when he is to pay,' but fails to do so."

*Gonzalez v. City of New York,* 148 A.D.2d 668, 539 N.Y.S.2d 418, 423 (2d Dept.) (emphasis omitted), *app. denied,* 74 N.Y.2d 608, 545 N.Y.S.2d 104, 543 N.E.2d 747 (1989).

In short, "a liability verdict has sufficient force of law to warrant the entry of a judgment on it." *Schabe v. Hampton Bays Union Free School Dist.,* 103 A.D.2d 418, 480 N.Y.S.2d 328, 336 (2d Dept.1984). A damages verdict has no such force. The Phase I interim verdict did not fix Crane's liability; it merely established the total amount of damages suffered by the plaintiff due to asbestos exposure. Thus, the verdict that matters for present purposes is the Phase II verdict, which the jury returned on March 13, 1992. This requires rejection of plaintiff's suggestion that post-judgment, pre-verdict interest should run from the Phase I verdict; instead, such damages begin to accrue on the date of the Phase II verdict.

Accordingly, applying an interest rate of 9%, compounded annually, the adjusted damages for past pecuniary loss are $18,-

---

5. Because I only discount future damages to the date of the verdict and not to the date of the injury, no pre-verdict interest is available on these awards. *See Milbrandt,* 580 N.Y.S.2d at 151.

626.30, and the adjusted damages for funeral expenses are $5,096.10. Interest thus adds a total of $1,722.40 to the jury's aggregate award, bringing aggregate damages to $5,919,504.25.

I now turn to the other computations required by CPLR § 5041(a).

### B. *Collateral Source Payments*

■ The parties dispute the existence of collateral source payments. The plaintiff contends that the amount of collateral source payments is zero. The defendant states that $170 received by the plaintiff every two weeks from 1976 until death as disability benefits for an unrelated injury and his monthly state pension of $1,042.37 constitute collateral source payments that should reduce the amount of lost earnings pursuant to CPLR § 4545.

CPLR § 4545 reduces a plaintiff's recovery for "economic loss" to the extent that any such loss "was or will, with reasonable certainty, be replaced or indemnified ... from any collateral source." CPLR § 4545.

However, no collateral source reduction is warranted here because the jury has already reduced the award for these income sources. The evidence that Crane relies on to demonstrate the existence of this income comes from testimony adduced at the damages phase of the trial. *See* Halbardier Aff., Ex. B (Tr. at 1214–16, April 23, 1991). The Court charged the jury with regard to lost income: "You should compute what he would have earned without the illness and subtract from that what was earned in view of the condition." Accordingly, no collateral source reduction is appropriate.

### C. *Setoffs under General Obligations Law § 15–108*

General Obligations Law § 15–108 allows a non-settling defendant to reduce the plaintiff's claim against him—

"to the extent of any amount stipulated by the release or the covenant [not to sue], or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of

the damages under article fourteen of the civil practice law and rules, whichever is the greatest."

Gen.Oblig.Law § 15–108(a).

■ The parties disagree as to the proper method for applying this statute and, in particular, whether it requires the Court to calculate setoffs in the aggregate or defendant-by-defendant. Plaintiff urges the Court to add up the dollar amount of all settlements, and then add up the amount of culpability that the jury apportioned to all settlors and then set off the larger of the two figures. Defendant insists that the Court must look at each settlor individually and set off either the greater of the amount paid by that settlor or its equitable share.

Judge Weinstein recently confronted this issue in the *Brooklyn Navy Yard* asbestos cases. After a typically thorough survey of the law in the area, Judge Weinstein concluded that New York law, while not entirely clear, most likely requires application of the defendant-by-defendant method and that a federal court in the exercise of its diversity jurisdiction must follow that rule. *In re Eastern & Southern Districts Asbestos Litig. (Brooklyn Navy Yard)*, (hereinafter "*BNY*") 772 F.Supp. 1380, 1393–97 (E.D.N.Y.1991). In reaching that conclusion, Judge Weinstein relied heavily on two State Supreme Court cases, both arising in the First Department of the Appellate Division, *In re New York City Asbestos Litig.*, 151 Misc.2d 1, 572 N.Y.S.2d 1006, 1008–09 (Sup.Ct., N.Y.Cty.1991), and *Williams v. Niske*, 147 Misc.2d 556, 557 N.Y.S.2d 1006 (Sup.Ct.N.Y.Cty.1989). On appeal, the Court of Appeals refrained from deciding this issue, instead electing to wait for the Appellate Division, First Department's decision in *Didner v. Keene*. *See In re Brooklyn Navy Yard, supra,* at 850–851.

While *Didner v. Keene* remains pending, the First Department has recently spoken to this issue in a case decided less than two weeks after the Court of Appeals handed down *In re Brooklyn Navy Yard, Williams v. Niske*, 181 A.D.2d 307, 586

N.Y.S.2d 942 (1st Dep't 1992). While *Williams* primarily addressed a use of § 15–108 not at issue here—what to do with settlors not allocated an equitable share by the jury—it articulated both broad principles and a specific holding that bear on the aggregation issue.

The broad principles outline the concerns to which § 15–108 addresses itself. In *Williams,* the First Department rejected an application of § 15–108 that "virtually exonerat[ed]" the single non-settling defendant in a multi-defendant tort suit. *Id.* That court, identifying the "overriding statutory objective of encouraging settlement," criticized any construction of § 15–108 that encouraged a defendant in a multi-defendant suit to hold out until the end in hopes that it would effectively escape liability by operation of set-offs. *Id.* In order to effectuate this statutory goal, the First Department refused to promulgate an inflexible rule on how to employ § 15–108, instead leaving it up to "the courts to determine the method of verdict reduction which best promotes the statute's broad objectives." *Id.*

After setting forth these principles, the court specifically took up plaintiff's aggregation argument. Although the First Department rejected that argument on the facts of that case for reasons of equity, it saw "no insuperable statutory obstacle to aggregating." *Id.* The court then went on to state: "[W]e think that it might very well be appropriate [to aggregate] in other contexts as a way to achieve the statute's goals, particularly where there has been an equitable apportionment as to all of the tortfeasors (*see In re Eastern and Southern Districts Asbestos Litigation,* 772 F.Supp. at 1393–97 …)."

*Williams* thus establishes that a court apportioning liability according to § 15–108 must apply that statute on a flexible, case-by-case basis so as to achieve "equitable results consonant with the statute's purpose of promoting settlement." *Id.*

As a decision of a state court of intermediate appeal subsequent to the release of the Second Circuit's *In re Brooklyn Navy Yard* opinion, *Williams* resolves the issue before this Court. As the decision overturned one of the central cases on which Judge Weinstein relied, *Williams* undercuts the force of his opinion.

The task here is to apply *Williams.* Both Crane and Keene would benefit from a defendant-by-defendant method of setting off. However, under the rationale of *Williams,* only Crane, and not Keene, may avail itself of this favorable method. I reach this result based on differences in the defendants' approaches to the trial and in the results that the defendant-by-defendant method yields. In *McPadden,* Crane held out in order to present a unique defense—encapsulization. Although it apparently did not persuade the jury of this defense, it nevertheless sought in good faith to try an issue, not simply to hold out in order to take advantage of other parties' settlements. Additionally, there is nothing inequitable about allowing Crane to use the defendant-by-defendant method in that it will still end up paying more than its equitable share of the verdict as found by the jury, due to the operation of joint and several liability. In contrast, neither of these factors is present in *Lewis.* Instead of offering a unique defense, Keene only presented a variation on the same theme that all settling manufacturers had already pursued. Nor is there anything in this case to suggest that Keene was following a strategy of maximizing any particular settlor's relative share of fault in order to reduce its own. Additionally, under the defendant-by-defendant method, Keene would end up paying substantially less than its equitable share of the verdict as found the the jury, leading to the very sort of inequitable result condemned in *Williams.*

Accordingly, the following is a list of settling defendants and each defendant's equitable share of liability as found by the jury in *McPadden* (asterisks denote whether the equitable share or amount of settlement is greater):

| Party | Settlement amount | % liability |
|---|---|---|
| Babcock & Wilcox | 20,000* | 0 |
| CCR | 190,000* | 2.5 |
| Combustion Engineering | 80,000 | 2* |
| Consolidated Edison | 125,000* | 2 |
| Eagle Picher | 33,500 | 11* |
| Empire Ace | 6,000* | 0 |
| Fibreboard | 590,000* | 2 |
| Garlock | 25,000 | 8* |
| General Motors | 10,000 | 1* |
| H.K. Porter | 15,000 | 1.5* |
| Owens–Corning | 300,000 | 6.5* |
| Owens–Illinois | 60,000 | 3* |
| Pittsburgh Corning | 60,000 | 3.5* |
| Rock Wool | 20,000 | 4* |
| U.S. Mineral | 10,000 | 2* |
| W.R. Grace | 44,500 | 3* |

■ Two issues with regard to this list deserve comment. First, the plaintiff's attorney suggests that he plans at some point to contest the verdict against Rock Wool and that the Court ought not consider their equitable share. No motion seeking that relief has been filed however. Accordingly, the 4% share of Rock Wool will be used to determine the judgment.

■ Second, plaintiff concedes that she has reached a settlement with Fibreboard for $590,000 (plus simple interest of 10% per annum). Plaintiff contends, however, that whether she will actually recover that amount remains speculative. Fearing that the welter of asbestos litigation will drive it into bankruptcy, Fibreboard has apparently taken to settling asbestos cases in terms of contingent obligations, colloquially known as "Fibrebucks," contingent on the resolution of litigation with its insurer, Continental Casualty Company. Plaintiff contends that, depending on the outcome of that litigation and Fibreboard's financial health, a Fibrebuck might become a worthless promise. Plaintiff consequently asks the Court to value the Fibrebuck at zero or, in the alternative, to discount them in light of the risk that ultimate recovery under the terms of the settlement will amount to considerably less than $590,000.

In the state court *Brooklyn Navy Yard* cases, Justice Freedman counted Fibrebuck at face value for the purposes of the General Obligations law. As there is no higher state case precisely on point and as uniformity among state and federal fora is desirable, Justice Freedman's conclusion deserves "great weight" in this Court's attempt to predict how the New York Court of Appeals would decide the issue. *BNY*, 772 F.Supp. at 1390. In this instance, however, the Court finds that New York's highest court would most likely reach the opposite result. *Id.* (quoting *DeWeerth v. Baldinger*, 836 F.2d 103, 108 (2d Cir.1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988)).[6]

Plaintiff draws the Court's attention to *McNair v. Owens–Corning Fiberglas Corp.*, 890 F.2d 753 (5th Cir.1989). That case construed a Texas statute that allowed offsets for the greater of (1) the "sum of the dollar amounts of all settlements" or (2) a dollar amount equal to a sliding scale that allowed offset of a certain percentage based on the size of the award. *Id.* at 755 n. 2 (quoting Tex.Civ. Prac. & Rem.Code Ann. § 33.012(b) (Vernon Supp.1989)). The Court held that, under the first prong, the non-settling defendants could not offset plaintiff's settlement

---

**6.** This and other issues are currently on appeal to the Appellate Division, First Department.

Plaintiff's argument before this Court consists of an excerpt from her state court brief.

with Fibreboard. The Fifth Circuit reasoned, "At the time judgment was entered, the [plaintiffs] were not entitled to the [Fibrebuck] because payment of the notes was (and presumably still is) contingent on the outcome of the litigations between ... Fibreboard and its insurer. If the litigation results in no additional payment being due, then the total settlement amount remains" as it was, without offset for the Fibreboard settlement. *Id.* at 756.

*McNair* is not controlling here as it turns on a Texas statute that differs significantly from the New York statute. The Texas statute allowed a setoff for "the sum of the dollar amounts of all settlements." *Id.* at 755 n. 2. In contrast, the New York statute permits a setoff for the "amount of the consideration" paid for the release. Gen.Oblig.Law § 15–108(a).

In New York, as elsewhere, the term "consideration" encompasses more than dollars. "As to consideration, any basic contemporary definition would include the idea that it consists of either a benefit to the promisor or a detriment to the promisee.... As elaborated in *Hamer v. Sidway* [124 N.Y. 538, 27 N.E. 256 (1891)], the seminal case on the subject, '[i]t is enough that something is promised, done, foreborne or suffered by the party to whom the promise is made as consideration for the promise made to him.'" *Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 196, 443 N.E.2d 441, 444 (1982). *See also Roth v. Isomed, Inc.,* 746 F.Supp. 316, 319 (S.D.N.Y.1990). Here Fibreboard has not paid the plaintiff any dollars, but it has given the plaintiff consideration in the form of a contingent obligation in exchange for the plaintiff's promise not to sue.[7]

Defendant sets off the Fibreboard settlement at its face value. The best argument for such a procedure, although nowhere mentioned by the defendant, might be the language of 15–108. That statute reduces the liability of the non-settling defendant by the "greatest" of (1) the "amount stipulated by the release," or (2) "the amount of consideration paid" for the release, or (3) "the amount of the released tortfeasor's equitable share." Gen.Oblig. § 15–108. The law clearly contemplates that the "amount stipulated" might differ from either the amount actually paid or the amount corresponding to the settlor's equitable share. Defendant could argue that $590,000 is the "amount stipulated," as distinct from the consideration paid.

The Second Circuit has apparently acknowledged this distinction in the language it has chosen to describe the operation of the statute:

> "If the non-settlors are found liable to the plaintiff for the same injury or wrongful death, their liability is reduced by the greatest of the following: the amount stipulated in the release, the amount of actual consideration given for the release, or the amount of the released tortfeasor's equitable share of the damages."

*Apple v. Jewish Hosp. & Med. Center,* 829 F.2d 326, 330 (2d Cir.1987). A New York state case has also made similar reference to "the greatest of the three items listed in section 15–108 (subd. [a])." *Bonnot v. Fishman,* 88 A.D.2d 650, 450 N.Y.S.2d 539, 540 (2d Dept.), *aff'd,* 57 N.Y.2d 870, 456 N.Y.S.2d 47, 442 N.E.2d 445 (1982).

Plaintiff's argument appears to ignore this distinction by conflating the amount stipulated with the actual value of that stipulation. Here plaintiff concedes that Fibreboard has stipulated to pay $590,000, plus interest, at a future date. Plaintiff's argument about the actual worth of this

---

7. The legislative history of 15–108 and related statutes confirms the point. In 1974 the New York legislature modified CPLR section 4533–b at the same time that it modified 15–108. Section 4533–b is a procedural rule that concerns proof of the existence of offsetting settlements. The 1974 modification authorized a court to deduct the "proper" amount for a settlement rather than "the amount of such payment." *See*

Judicial Conference Report on CPLR, *reprinted in* 2 McKinney's 1974 Session Laws at 1815. That change corresponded to 15–108, which made it possible "that damages may be mitigated by an amount in excess of the payment made by a joint tortfeasor, and this Rule provides that the court shall deduct the 'proper amount' in accordance with General Obligations Law § 15–108." *Id.* at 1816.

agreement goes to the consideration paid, not the amount stipulated.

Examination of judicial opinions from states that have adopted the Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 57 (1975), illuminates the language of 15–108. The Law Review Commission that proposed what is now General Obligations Law § 15–108(a) noted that the proposal derived from the Uniform Contribution Among Joint Tortfeasors Act. 1972 Leg.Doc. No. 65, *reprinted in* 2 McKinney's 1972 Session Laws 3213, 3239. The Uniform Act, like 15–108 (and unlike the Texas statute), states that a settlement "reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater." Uniform Act § 4(a), 12 U.L.A. 98.

At least one court construing the term "amount stipulated" has reached a result favorable to the defendant in this action. *See Tommy's Elbow Room, Inc. v. Kavorkian*, 754 P.2d 243 (Alaska Sup.Ct.1988). There a plaintiff settled a wrongful death and personal injury action with two of three joint tortfeasors. One of the defendants settled for $1,230,000, but that amount was contingent upon the outcome of a suit against the defendant's insurer; the settling defendant assigned the right to prosecute that case to the plaintiff as a part of the settlement. A lower state court held that the contingent nature of the recovery prevented the single non-settling defendant from setting off any portion of the $1,230,000. The state supreme court reversed, concluding that the lower court had failed to distinguish between the "amount stipulated" and the "amount of the consideration paid," a distinction "unambiguous[ly]" drawn by the state statute. *Tommy's Elbow Room*, 754 P.2d at 245–46.

The Ninth Circuit, construing a California law similar to Alaska's, has persuasively explained the flaw in *Tommy's Elbow Room*. In *Federal Savings and Loan Ins. Corp. v. Butler*, 904 F.2d 505 (9th Cir. 1990), the court parsed the history of the Uniform Act. *Id.* at 514. The 1939 version

of that Act stated that a good faith settlement reduced the claim against non-settling tortfeasors "in the amount of the consideration paid for the release, *or in any amount or proportion by which the release provides that the total claim shall be reduced." Id.* (quoting Uniform Contribution Among Tortfeasors Act of 1939 § 4, *reprinted in* 12 U.L.A. 57–58) (emphasis supplied by Ninth Circuit). The Ninth Circuit found this language "very clear": "[T]he amount to be set off, if greater than the consideration paid, is the amount the parties provide the claim is to be reduced." *Id.* at 514. Subsequent modification of the Act's language was not designed to change its meaning. *Id.*

Simply put, the history of the Act demonstrates that a stipulation as to the amount to be set off differs from a stipulation as to the settlor's liability. *Id.* at 512. The Ninth Circuit also explained that a plaintiff would agree to set off more than the amount of consideration in order to persuade a reviewing court that the settlement was executed in "good faith." *Id.* A California state court has endorsed *Butler*. *See Arbuthnot v. Relocation Realty Serv. Corp.*, 227 Cal.App.3d 682, 278 Cal.Rptr. 135, 138–39 (Ct.Apps., 1st Dist.1991).

New York would also likely follow *Butler*. The statutory history of 15–108 and related statutes is consistent with such a result. The Law Review Commission's report in support of 15–108 specifically referred to both the 1939 and 1955 versions of the Uniform Act. *See* McKinney's 1972 Session Laws at 3239.

Furthermore, while the New York Court of Appeals has not confronted this issue directly, it has explained its understanding of the term "amount stipulated." In discussing that portion of 15–108, the court explained:

"To the extent that the injured party and the original tort-feasor are permitted to stipulate the amount by which the liability of the successive tort-feasor is to be reduced by the original tort-feasor's payment, intent remains a factor, but the amount stipulated must also be shown to have been arrived at in good faith. The

reference in the subdivision to the amount paid for the release may have been inserted because releases so often recite that they have been given 'for one dollar and other good and valuable consideration.' But even if a substantial sum is recited, the consideration stated may be less than the amount paid in fact."

*Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72, 499 N.Y.S.2d 904, 912, 490 N.E.2d 823 (1986). This language demonstrates that, when § 15–108 refers to an "amount stipulated," it means the amount by which the parties have in good faith agreed to offset the plaintiff's recovery, not the amount of liability. *See In re Brooklyn Navy Yard, supra*, at 849 n. 5.

Accordingly, while the statute makes plain that the Court must offset the consideration paid by Fibreboard, the quantum of that offset remains speculative and ranges somewhere between zero and $590,000. While "the burden of proof as to the validity of a release is on the defendant who pleads it, ... a releasor who seeks to limit the *effect* of a release ... has the burden of proof on that issue." *St. Clare's Hosp.*, 499 N.Y.S.2d at 911, 490 N.E.2d at 830. The plaintiff must demonstrate "why and to what extent [the settlement] should be accorded less than its apparent full effect." *Carter v. State*, 139 Misc.2d 423, 528 N.Y.S.2d 292, 296 (Ct.Cl.1988), *aff'd*, 154 A.D.2d 642, 546 N.Y.S.2d 648 (2d Dept. 1989). Here, plaintiff has not provided the Court with any rational basis for evaluating the true worth of the Fibrebuck. A rule, such as that requested by plaintiff, that treated contingent settlements as zero would not only be unfair to the defendant but also might encourage all plaintiffs to make all settlements contingent upon some future event so as to reduce the total setoffs to nothing and collect full joint and several recovery from non-settlors. *Cf. Apple*, 829 F.2d at 331 (rejecting proposed allocation of settlements on basis that it would permit plaintiffs to structure settlements so as to avoid 15–108).

Accordingly, at this time the Court offsets the entire amount of the settlement with leave for the plaintiff to move for modification of the judgment upon presentation of competent proof as to the value of the Fibreboard settlement. *See Butler*, 904 F.2d at 515 (requiring proof on valuation of assignment of claim against insurer); *St. Clare's Hosp.*, 499 N.Y.S.2d at 912, 490 N.E.2d at 831 (requiring proof of amount paid, if different from recital in release); *Carter*, 528 N.Y.S.2d at 298–99 (no recovery where plaintiff failed to prove that settlement had not fully satisfied claim).

Therefore, applying the defendant-by-defendant method to the above settlors, including Rock Wool and Fibreboard, demonstrates that the total setoff for settlement amounts that exceed equitable shares is $931,000. The total setoff for the equitable shares that exceed settlement amounts is $2,708,029.35 (45.5% × 5,951,712.86). Thus the total setoff for settlors is $3,639,-029.35.

### D. *Article 16*

Under traditional tort law it would be easy enough simply to conclude that the defendant was jointly and severally liable for the difference between the adjusted verdict amount and the 15–108 setoffs. The New York legislature, however, has imposed an additional limitation on the plaintiff's ability to recover from a non-settling defendant: Article 16 of the CPLR, which provides:

"1. Notwithstanding any other provision of law, when a verdict or decision in an action or claim for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable ... and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss; provided, however that the culpable conduct of any person not a party to the action shall not be considered in determining any equita-

ble share herein if the claimant proves that with due diligence he was unable to obtain jurisdiction over such person in said action ...

2. Nothing in this section shall be construed to affect or impair any right of a tortfeasor under section 15–108 of the general obligations law."

CPLR § 1601.

The parties raise two Article 16 issues in this case: the relationship between Article 16 and General Obligations Law section 15–108 and whether the plaintiff was "unable to obtain jurisdiction" over certain joint tortfeasors.

The parties sharply disagree over the relationship between the limitations imposed by Article 16 and the General Obligations Law. Plaintiff argues that the Court should compare the defendant's liability under Article 16 with that under 15–108 and then choose the amount more favorable to the defendant. The defendant contends that Article 16 adds to the limitations already found in 15–108: once the Court has already calculated 15–108 set-offs, it should then restrict the plaintiff's recovery against any non-settling defendant to that defendant's equitable share of the already reduced verdict. Neither party has cited authority in support of the method it espouses.

The Second Circuit has recently resolved this issue. *In re Brooklyn Navy Yard, supra.* It explained the proper interplay between § 15–108 and Article 16:

> "The calculations pursuant to each statute should proceed unaffected by the other statute, as follows: (1) Ascertain the section 1601 liability cap. If the jury apportioned fifty percent or less of fault to a defendant, section 1601 mandates that 'the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share.' NYCPLR § 1601(1) (McKinney Supp.1992). Thus, multiply the total amount of non-economic damages by the defendant's share of fault. The defendant's liability for non-economic damages may not exceed the resulting figure. (2) To calculate the section 15–108 set-off,

first multiply the total verdict by the settling defendant's share of fault. If the result is greater than the settlement amount, then that figure is the amount of the set-off; if the settlement amount is greater, then the set-off equals the settlement amount. (3) Subtract the 15–108 set-off from the total verdict, to determine the amount of liability remaining. (4) Multiply the amount of liability remaining after the set-off by the percent of the total verdict that the jury deemed economic damages. For example, if the jury awarded $75,000 non-economic damages and $25,000 economic damages, the liability remaining would be multiplied by 25 percent. The resulting figure is the amount of economic damages remaining after the settlement set-off. Non-settling defendants are jointly and severally liable for this amount. (5) Multiply the amount of total liability remaining after the set-off by the percent of the total verdict that the jury deemed non-economic damages. The resulting figure is the amount of non-economic damages for which the non-settling defendants may potentially be held liable. Each defendant's liability for non-economic damages, however, is limited by section 1601 as calculated in step 1 above.

> "Thus, section 15–108 and section 1601 work independently, but not successively. Each section's calculation proceeds from the original verdict, and each section's impact—the 15–108 set-off and the 1601 cap—retains its significance notwithstanding the application of the other section."

■ Another Article 16 controversy revolves around the share of liability attributed to joint tortfeasors other than Crane. When making calculations under Article 16—

> "the culpable conduct of any person not a party to the action shall not be considered in determining any equitable share herein if the claimant proves that with due diligence he was unable to obtain jurisdiction over such person in said action."

CPLR § 1601(1). The parties agree that both bankrupts, *see BNY*, 772 F.Supp. at 1404–05, *aff'd, In re Brooklyn Navy Yard, supra,* at 846, and defendants whose New York state residence prevents the Court from exercising diversity jurisdiction over them in the instant suit, *see id.* at 1405; *In re Joint Eastern & Southern Districts Asbestos Litig. (Dutcher),* 1990 WL 124330 (S.D.N.Y.1990), are not subject to the Court's jurisdiction for Article 16 purposes. The parties disagree, however, over which defendants fall into those categories.

In particular, Crane contends that certain joint tortfeasors which the plaintiff seeks to exclude from the Article 16 calculation were not bankrupt at the time the plaintiff filed this suit in May 1990. As a consequence, contends defendant, the plaintiff was not "unable to obtain jurisdiction" over them in this action. At the time of filing, H.K. Porter, Eagle Picher, Carey Canada, and Celotex had not yet declared bankruptcy, and suits were permitted against the Manville Trust. The plaintiff excluded these companies from its list of "Article 16 fault sharers." Plaintiff contends that amenability to suit ought to be measured at the time of trial, not filing.

■ The language and structure of Article 16 favor the plaintiff. While it is certainly true that Article 16 "essentially forced a plaintiff to sue all alleged tortfeasors," *Zakshevsky v. City of New York,* 149 Misc.2d 52, 562 N.Y.S.2d 371, 372 (Sup. Ct. Kings Cty.1990), it nowhere requires the plaintiff to do so on the date the action is commenced. The period of time it contemplates is defined by the "action," not the filing date. Certainly if a New York tortfeasor moved out of state after commencement of the action, the defendant would rightly insist that plaintiff attempt to bring that wrongdoer into the action or suffer Article 16 consequences.

■ Additionally, a plaintiff does not lack "diligence" if she fails to sue all potential tortfeasors on the day the action commences. If Article 16 required that, it would be a hard rule indeed, harkening back to the days of form pleading and repudiating the liberal pleading and joinder

provisions of the Federal Rules of Civil Procedure, as well as New York's " 'strong public policy ... for resolving disputes on their merits' " rather than on technicalities. *Ackerson v. Stragmaglia,* 176 A.D.2d 602, 575 N.Y.S.2d 44, 46–47 (1st Dep't 1991) (quoting *Picinic v. Seatrain Lines, Inc.,* 117 A.D.2d 504, 497 N.Y.S.2d 924, 927 (1st Dep't 1986)).

Thus, Article 16 requires the Court to look beyond the pleading that commenced the suit and determine the last date in the "action" that a plaintiff could have joined a defendant had she exercised "due diligence." Determining that time period requires the Court to ascertain a date past which the Court would not have allowed a plaintiff to sue the absent tortfeasor.

■ Rule 20(a) of the Federal Rules of Civil Procedure permits a plaintiff to join defendants in a single action "if there is asserted against them jointly, severally or, in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Rule 21 further defines the scope of Rule 20. *Giorgio Morandi, Inc. v. Textport Corp.,* 761 F.Supp. 12, 14 (S.D.N.Y.1991). Rule 21 states, "Parties may be ... added by order of the court ... at any stage of the action and on such terms as are just." Similarly, Rule 15(a) allows a party to amend the pleadings with leave of the court, "and leave shall be freely given when justice so requires." *See Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1479 (Fed.Cir.1990) (same standard applies whether party is added under Rule 15 or Rule 21); *First City Nat. Bank v. Federal Dep. Ins. Co.,* 730 F.Supp. 501, 515 (E.D.N.Y.1990) (use liberal application of Rule 15 to add defendants). The standards for such an amendment plainly demonstrate that the Federal Rules leave concerns about the timeliness of joinder to the discretion of the district court. *See Diamond v. FEMA,* 689 F.Supp. 163, 168 n. 6 (E.D.N.Y.1988); *Andujar v. Rogowski,* 113 F.R.D. 151, 154 (S.D.N.Y.1986). *Cf. Farmland Dairies v. Commissioner of N.Y.*

*State Dep't of Agriculture and Markets,* 847 F.2d 1038, 1043 (2d Cir.1988) (timeliness of intervention committed to district court's discretion).

With these rules and this background in mind, I turn to the facts of this case. The action commenced on May 22, 1990. Carey Canada and Celotex filed for bankruptcy on October 12, 1990; Eagle Picher filed for bankruptcy on January 7, 1991; and H.K. Porter filed for bankruptcy in February 1991. This Court would have, without doubt, permitted the joinder of those defendants after any of those dates.

Manville is a special case. Johns–Manville first filed for federal bankruptcy protection under Chapter 11 of the Bankruptcy Code on August 26, 1982. *See In re Joint E. & S. Dists. Asbestos Litig.,* 120 B.R. 648, 651 (E.D.N.Y.1990). Pursuant to a 1986 reorganization plan, an entirely different organization, the Manville Trust, "became the exclusive entity from which to seek compensation for existing and future asbestos health claims caused by exposure to Johns–Manville products. An injunction insulated the Manville Corporation from any asbestos—related litigation." *In re Joint E. & S. Dists. Asbestos Litig.,* 129 B.R. 710, 752 (E.D.N.Y.1991); *see also Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988). Nevertheless, by "the Spring of 1990, the Trust was effectively out of money." *In re Joint E. & S. Dists. Asbestos Litig.,* 120 B.R. at 652. Accordingly, on July 9, 1990, Judge Weinstein effectively made the Trust inoperable by staying both payments from and the enforceability of judgments against it. *Id.* at 653. Further stays preserving the corpus of the Trust followed. *Id.* These injunctions and one expressly barring commencement of any new proceedings against the Trust gained a new level of permanence on November 30, 1990. *Id.* at 659. Thereafter, Judge Weinstein approved a complex settlement structuring payment of all future claims from the Manville Trust and preventing any further tort litigation. *See generally In re S. & E. Dists. Asbestos Litig.,* 129 B.R. 710.

The Court of Appeals has indicated that for Article 16 purposes the question is not whether jurisdiction could have been obtained in a technical sense but rather whether a plaintiff could, with the exercise of due diligence, have obtained "effective jurisdiction." *In re Brooklyn Navy Yard, supra,* at 846. Thus, bankrupts, while technically subject to suit but stayed from participating in litigation or paying judgments, are excluded from the Article 16 calculation. *Id.* This is precisely the situation confronting plaintiff with regard to Manville: as of July 9, 1990, that company was effectively not amenable to suit due to judicially imposed stays.

Accordingly, I find that plaintiff's time in which to sue all five bankrupts had not expired as of the respective dates they went bankrupt. The latest bankruptcy filing occurred more than a month before the trial was slated to begin. Even at that late stage, I would undoubtedly have allowed addition of more defendants, given the peculiar circumstances of this litigation including the familiarity of all of the parties with the issues and the need for consolidated proceedings. Thus, all these parties should be excluded from the Article 16 calculation.

■ The defendant also contends that, since Owens–Corning Fiberglas impled Consolidated Edison, Garlock, Empire Ace, Keene, Robert A. Keasby, and W.R. Grace as third-party defendants, they were parties to the action and, thus, should count as defendants for Article 16 calculations. The plaintiff has settled with two of these companies.

The statute excludes from consideration a party if "the claimant proves that with due diligence *he* was unable to obtain jurisdiction over such person in said action." CPLR § 1601(1) (emphasis added). Due to jurisdictional limitations, at no time in this litigation could the plaintiff have asserted jurisdiction over these joint tortfeasors.

Giving effect to the straightforward meaning of this language makes good sense. The fact that claims against these companies were third-party rather than direct claims certainly weakened the plaintiff's bargaining position, *cf. Klinger v. Dudley,* 41 N.Y.2d 362, 393 N.Y.S.2d 323,

361 N.E.2d 974 (1977) (plaintiff has no right to recover directly from third-party defendant, even if direct defendant is insolvent), and thus lessened the chances of full recovery. Moreover, to adopt the defendant's interpretation could encourage an unscrupulous litigation tactic: a defendant could simply implead the entire universe of potential fault sharers and then dismiss those third-party actions, thereby using Article 16 to reduce the plaintiff's recovery against it but leaving the plaintiff with no opportunity to recover against those other fault sharers.

■ Defendant also contends that the plaintiff could have obtained jurisdiction over the United States pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741 *et seq.;* the Public Vessels Act, 46 U.S.C. §§ 781 *et seq.;* the Jones Act, 46 U.S.C. § 688; 28 U.S.C. § 1333; or general maritime law. Plaintiff states that the Court could not have exercised jurisdiction over the United States due to restrictions imposed by the doctrine of sovereign immunity and workers' compensation laws. The decedent's service in the United States Navy, which began in 1956, forms the factual predicate for any claim against the United States.

■ The Court could not have exercised subject matter jurisdiction over the United States in this case. The Court lacks subject matter jurisdiction to hear tort claims against the military by servicemen "where the injuries arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950). This rule applies to claims brought under the Public Vessels Act and Suits in Admiralty Act. *Bon v. United States*, 802 F.2d 1092, 1094 n. 2 (9th Cir.1986); *Cusanelli v. Klaver,* 698 F.2d 82, 85 (2d Cir.1983); *Veloz–Gertrudis v. United States*, 768 F.Supp. 38, 40 n. 2 (E.D.N.Y.1991). *Cf. In re Joint Eastern & Southern Districts Asbestos Litig. (Robinson),* 891 F.2d 31 (2d Cir.1989) (use of asbestos on naval ships during World War II was discretionary function, which divested Court of subject matter jurisdiction under Suits in Admiralty Act). Without doubt, a serviceman's installation of asbestos in naval vessels constitutes a course of activity incident to service. The Jones Act, general maritime law, and 28 U.S.C. § 1331 provide no further waiver of sovereign immunity. *See* 1 *Benedict on Admiralty: Jurisdiction* § 131, at 8–76 (7th ed. 1991) (waiver of sovereign immunity under "two statutes," Suits in Admiralty Act and Public Vessels Act, which require strict compliance). Because the Court could not have exercised subject matter jurisdiction over the United States in this action, the culpability of the United States will not be considered in the Article 16 calculation.

In light of the foregoing analysis, Article 16 excludes the following parties from the allocation of liability for non-economic losses:

| Party | % liability |
| --- | --- |
| Asbestospray | 1.5 |
| Carey Canada | 1.5 |
| Celotex | 7 |
| Con Edison | 2 |
| Eagle Picher | 11 |
| H.K. Porter | 1.5 |
| Johns–Manville | 12 |
| Keene | 4.5 |
| Raymark | 2 |
| Richmond Asbestos | 2 |
| R.A. Keasby | 3.5 |
| Rock Wool | 4 |
| Unarco | 2 |
| United States | 1 |
| W.R. Grace | 3 |
| Total. . . | 58.5 |

That leaves the following parties as Article 16 fault sharers:

| Party | % liable |
| --- | --- |
| Combustion Engineering | 2 |
| Exxon Corp. | 1 |
| Fibreboard | 2 |
| GAF | 2.5 |
| Garlock | 8 |
| General Motors | 1 |
| Owens–Corning | 6.5 |
| Owens–Illinois | 3 |
| Pittsburgh Corning | 3.5 |
| U.S. Mineral | 2 |
| Total. . . | 31.5 |

Once this former group of parties drops out of the equation, CPLR § 1601(1), defen-

dant is liable for 10/41.5 of the damages for non-economic losses.[8] This leaves defendant responsible for 24.1% of those losses.

### E. *Calculating the Losses After Setoffs*

As already discussed, Article 16 imposes a cap on non-economic losses only. Thus, to determine Article 16's applicability, the Court must divide the verdict amount, adjusted for interest and setoffs, into economic and non-economic losses.

As most of the settlements do not state whether they apply to economic or non-economic losses, I subtract them from the total verdict in the same proportion that economic losses bore to non-economic losses in that verdict. *See, e.g., Merrill v. State,* 110 Misc.2d 260, 442 N.Y.S.2d 352, 358 (Ct.Cl.1981), *aff'd,* 89 A.D.2d 802, 453 N.Y.S.2d 383, 384 (4th Dept.1982); *Hager v. Hutchins,* 91 Misc.2d 402, 398 N.Y.S.2d 316, 319 (Sup.Ct., Orange Cty.1977). The total verdict is $5,919,504.25. Non-economic losses account for $4,900,000 of this award. Thus the share of the verdict attributable to non-economic losses is 82.8%; the share attributable to economic losses is 17.2%.

 The fact that one of the stipulations of settlement specifically dedicates the proceeds to the wrongful death losses adds further complexity. On November 13, 1991, the Court approved a stipulation of settlement between the plaintiff and Consolidated Edison, General Motors, Owens–Corning Fiberglas, Rock Wool, and U.S. Mineral for $465,000. Defendant contends and plaintiff apparently agrees that this stipulation devoted the entire amount of the settlement to the wrongful death claims, although it also released the settling defendants from liability on all other causes of action. This issue has become the object of dispute because, notwithstanding Article 16, the defendant is jointly and severally liable for the total amount of economic losses and, thus, every setoff against that portion of the award reduces the plaintiff's joint and several recovery. Plaintiff's counsel responds that the desire

promptly to distribute the settlement proceeds to the McPadden family produced this element of the stipulation and that, were the Court to set off the entirety of this settlement against the non-economic losses, it would reach an unjust result.

Turning first to the settlement itself, it does appear to allocate the entire settlement to satisfaction of the wrongful death claim. It states its purpose: "to compromise this action arising out of the death" of Martin McPadden. It also recites:

> ORDERED, that the within action against the settlement defendants is settled in the amount of $465,000.00; and it is further
>
> ORDERED, that the survival action, and all other actions against the settling defendants are discontinued with prejudice and without costs."

The petition filed by the plaintiff in support of this settlement clarifies any lingering ambiguity in parties' intent. Ann McPadden submitted an affidavit which described the stipulation and order and "allocating this entire sum [$465,000] as settlement of a cause of action for wrongful death."

 Plaintiff's equity-based argument fails. Since general contract principles apply to settlements, *Bartel Dental Books Co. v. Schultz,* 786 F.2d 486, 488 (2d Cir.), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3298, 92 L.Ed.2d 713 (1986); *Aetna Casualty & Surety Co. v. Jackowe,* 96 A.D.2d 37, 468 N.Y.S.2d 153, 157 (2d Dept.1983), courts must give effect to the clear terms of a release. *Omaha Indemnity Co. v. Johnson & Towers, Inc.,* 599 F.Supp. 215, 219 (E.D.N.Y.1984); *LeMay v. H.W. Keeney, Inc.,* 124 A.D.2d 1026, 508 N.Y.S.2d 769, 770 (4th Dept.1986), *app. denied,* 69 N.Y.2d 607, 514 N.Y.S.2d 1025, 507 N.E.2d 321 (1987). Ambiguities in the release are construed against the drafter, *Geise v. County of Niagara,* 117 Misc.2d 470, 458 N.Y.S.2d 162, 165 (Sup.Ct., Erie Cty.1983), which in this case is the plaintiff. Moreover, where ambiguities exist, the Court may look to indicia of the intent of the

---

8. 41.5 is calculated by adding the defendant's own share to that of Article 16 fault sharers.

parties, *Marvel Entertainment Group v. Young Astronaut Council,* 747 F.Supp. 945, 947–48 (S.D.N.Y.1990), including statements executed contemporaneously with the settlement, *Feldbau v. Klarnet,* 109 Misc.2d 32, 439 N.Y.S.2d 596, 600 (Civ.Ct., City of N.Y.1981). In this case, I find that the document itself clearly evinces an intent to devote the entirety of the settlement to the wrongful death cause of action—a view that is reinforced by the Ann McPadden affidavit.

■ In light of these principles, the fact that the plaintiff structured the release for a different purpose than the use to which it is now put by the defendant is "irrelevant." *LeMay,* 508 N.Y.S.2d at 770. Where a party stipulates as to a condition of a settlement, he cannot later ask the court to reevaluate the term for purposes of setting off under General Obligations Law § 15–108. *See Reinitz v. Arc Elec. Constr. Co.,* 104 A.D.2d 247, 483 N.Y.S.2d 821 (3d Dept. 1984) (stipulation as to value of settlement).

■ It is also evident under New York law that a party can compromise certain claims while reserving others. *See, e.g., Herman v. Malamed,* 110 A.D.2d 575, 487 N.Y.S.2d 791, 793 (1st Dept.1985).

■ While the plaintiff's equity-based argument fails, one based on law succeeds. Here, the plaintiff not only settled the wrongful death claim against these defendants but also agreed in the same document to discontinue all other claims as well. The Second Circuit has directly ruled on the consequences of such a settlement for 15–108 purposes, adopting a position favorable to the plaintiff in this action. In *Apple v. Jewish Hospital and Medical Center,* 829 F.2d 326 (2d Cir.1987), the Second Circuit confronted a release very similar to that executed here in that it purported to settle a wrongful death claim while it merely discontinued the claim for pain and suffering. The Court held that there should have been a 15–108 setoff "for both claims." *Id.* at 331.

The fact that *Apple* turned on concern for the defendant, rather than the plaintiff, does not render it any less applicable to the instant case. The Court of Appeals reasoned that permitting the plaintiff to allocate the liability as he saw fit would encourage the plaintiffs' bar to "manipulat[e]" settlements so as to make a non-settling defendant "bear more than its equitable share." *Id.* The corollary, however, is that a defendant should not, simply by the operation of a settlement that effectively eliminates all claims, be able to escape paying its equitable share. Moreover, the Court of Appeals in *Apple* laid down a rule which over the long run inures to the benefit a non-settling defendant. Defendant presents no reason to amend that sensible rule in the context of this litigation.

Consequently, 82.8% of the $3,639,029.35 in settlements will be set off against the the award for non-economic losses, and the remaining 17.2% will be set off against economic losses. Accordingly, the total 15–108 setoff against non-economic losses is $3,013,116.30, and the total 15–108 setoff against economic losses is $625,913.05. That leaves $1,886,883.70 in non-economic losses and $393,591.20 in economic losses.

Article 16, however, limits the ability of the plaintiff to recover against this defendant for non-economic losses. As already discussed, the plaintiff may recover only 24.1% of the non-economic losses. Translating that percentage into dollars leaves the defendant responsible to the plaintiff for $1,180,900 (24.1% × $4,900,000) in non-economic losses.

There can be no dispute that the defendant is jointly and severally liable for the full portion of economic damages. Neither Article 16 nor any other statute alters this common law rule. To the extent that defendant objects that this amount represents, at least in part, a "reallocation" of non-parties' equitable shares, Judge Weinstein responded to that argument in the *Brooklyn Navy Yard* case. *See BNY,* 772 F.Supp. at 1399–1403, *aff'd, In re Brooklyn Navy Yard, supra.* The sum of $61,-793.82 represents what remains of the damages for past economic losses. Several calculations, however, remain with regard to future economic damages.

## F. *Annuity for Future Losses*

█ Section 5041 of the CPLR, which one State Supreme Court Justice termed "every judges' nightmare," *Rohring v. City of Niagara Falls,* — Misc.2d —, 584 N.Y.S.2d 513 (Sup.Ct., Niagara Cty. 1992), treats past and future damages differently. In particular, it requires the court to "enter judgment in lump sum for past damages, for future damages not in excess of two hundred fifty thousand dollars," and for attorneys' fees. CPLR § 5041(b) & (c). With regard to all future damages in excess of $250,000, "the court shall enter a judgment for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments." CPLR § 5041(e). This statute applies to federal courts sitting in diversity. *See Alisandrelli v. Kenwood,* 724 F.Supp. 235, 252 (S.D.N.Y.1989).

Future damages of $294,000 represented 28.8% of the total economic damages prior to the preceding reductions. Future damages of $565,981.85 represented 55.5% of those damages. Thus, the amount of each award that survives molding is $113,354.27 and $218,443.17, respectively.

Under section 5041(b), the first $250,000 of this amount is payable as a lump sum. CPLR § 5041(b).[9] "For purposes of this section, any lump sum payment of a portion of future damages shall be deemed to include the elements of future damages in the same proportion as such elements comprise of [sic] the total award for future damages as determined by the trier of fact." The $113,354.27 sum represents 34.2% of the total, post-molding, economic damages. The $218,443.17 sum represents 65.8% of these damages. Thus, in order to determine the portion of the $250,000 lump sum payment attributable to each element of damages, the Court multiplies each of these percentages by $250,000. Accordingly, the $113,354.27 sum contributes some $85,500 to the $250,000 lump sum payment. Similarly, the $218,443.17 sum contributes $164,500.

A certain remainder exists with regard to each sum after it is reduced by its contribution to the $250,000 lump sum payment. The first sum's remainder is $28,354.27. The second sum's remainder is $53,943.17.

Under CPLR § 5041(e), these remainders must be structured as annuities to be paid out over "the period of years determined by the trier of fact in arriving at the itemized verdict."

The statute also describes how to calculate the payment for each period. "The annual payment for the first year shall be calculated by dividing the remaining amount of future damages by the number of years over which such payments shall be made and the payment due in each succeeding years shall be computed by adding four percent to the previous year's payment ... Unless otherwise agreed, the annual sum so arrived at shall be paid in equal monthly installments and in advance." CPLR § 5041(e).

█ The statute, as already noted, requires the Court to enter judgment for the present value of such an annuity contract. But, even this dictate is thornier than it at first appears. Section 5041(c) states that attorneys' fees on the future periodic payments are payable "in a lump sum, based on the present value of the annuity contract purchased to provide payment of such future periodically paid damages pursuant to subdivision [5041](e)." Section 5041(e) instructs the Court to enter judgment based on the present value of an annuity contract—

"[a]fter making any adjustment prescribed by subdivision [ ] ... (c)." Thus, as more than one court has noted, "the

---

**9.** The statutory scheme makes clear that this amount is not to be reduced to present value. Section § 4111(f) of the CPLR requires the Court to instruct the jury not to discount the award. The Court followed that rule. See Tr. at 3604–06, July 19, 1991. The structured judgment statute "is supposed to take care of [discounting] with a different set of computations."

David Siegel, 1985 Practice Commentary to Rule 4111 (McKinney's CPLR § 4111, Supp.1992) (referring to structured judgment in medical malpractice actions, on which § 5041 is based). The structured judgment statute only mentions discounting to present value with regard to that portion of future damages that exceeds $250,-000. CPLR § 5041(b) & (e).

statute adopts a procedure that is somewhat circular.... [B]efore one can compute the attorneys' fees it is necessary to determine the present value of the annuity contract as set forth in subdivision (e). However, subdivision (e) refers to the amount of the award after making any adjustment prescribed in subdivisions (b), (c), and (d). Were the statute to be literally interpret[ ]ed, it would not be possible to compute the attorney's fees until the present value of the annuity contract is determined and the present value of the annuity contract cannot be determined until the attorney's fee is calculated and deducted."

*Ursini v. Sussman,* 143 Misc.2d 727, 541 N.Y.S.2d 916, 919 (Sup.Ct.N.Y.Cty.1989); *see also Marulli v. Pro Security Service, Inc.,* 151 Misc.2d 1077, 583 N.Y.S.2d 870 (Sup.Ct.Kings Cty.1992). These courts have, thus, required two calculations: "A calculation of the attorney's fee based on a determination of the present value prior to the deduction of the attorney's fee and a second calculation to determine the future payments to plaintiff after deduction of the attorney's fee." *Ursini,* 541 N.Y.S.2d at 919; *Marulli,* 583 N.Y.S.2d 870.

One federal district court has used a simpler but apparently erroneous method for making this computation. In *Frey v. Chester E. Smith & Sons, Inc.,* 751 F.Supp. 1052, 1057 (N.D.N.Y.1990), the court calculated the present value of each period's payment and then subtracted 33% (the contingent fee amount) from each period's payment. The court then awarded the remaining amount as the present value of the annuity contract. Under the statute, however, this approach appears incorrect. The annuity contract is to pay out amounts which the defendant owes over and above the lump sum payments. The attorney's fee, although derived from the present value of an annuity contract, is a lump sum payment. Thus, it must be subtracted from the total amount of damages as found by the jury, not from the present value of those damages (which is always less than the face amount of the jury's award).

Determining present value requires the court to fix upon a discount rate. Here, in making other calculations, the parties implicitly agreed upon a 6% discount rate.

I note that computing the present value of the annuity required by New York law has vexed courts, in some instances demanding "literally hundreds of tedious arithmetic calculations." *Frey,* 751 F.Supp. at 1056–58. Those other courts have apparently made the calculations manually: adding interest for each year, then discounting that increased sum to present value, and finally adding up the present value figures for each year to arrive at an aggregate present value. This method requires as many iterations as there are years over which the annuity must be distributed. While this method may not present any great problem where payments extend over just a few years, when these payments stretch over more than 2½ decades, the math becomes burdensome, especially when one considers that to calculate properly the lump-sum attorneys' fee, the computations must be performed twice. Here, I have opted for a simpler method. I calculate present value of the annuity by a formula derived from a popular textbook, Richard Brealey & Stewart Myers, *Principles of Corporate Finance* 33–36 (4th ed. 1991):

$$Pv = \frac{C_1}{r-g} - \frac{C_1(1+g)^t}{(r-g)(1+r)^t}, \text{ which simplifies to:}$$

$$Pv = C_1 \left[ \frac{1}{r-g} - \frac{(1+g)^t}{(r-g)(1+r)^t} \right]$$

This formula actually represents the present value of a perpetuity, minus the present value of a perpetuity starting "t" years from now. The difference is the present value of a perpetuity that runs during the time between now and "t" years from now.

In this equation, $C_1$ represents the first payment, which the statute itself states must be derived by dividing the total amount to be annuitized by the number of years of payment. Here, the amount is: $28,354.27 divided by 7, or $4,050.61. The "r" represents the discount rate, here 6%; "g" represents the rate of interest, which the statute sets at 4%; "t" represents the number of years over which the annuity must be paid. Inserting these numbers, the equation becomes:

$$Pv = 4050.61 \left[ \frac{1}{.06-.04} - \frac{(1+.04)^7}{(.06-.04)(1+.06)^7} \right] \Rightarrow$$

$$Pv = 4050.61 \left[ \frac{1}{.02} - \frac{1.3159318}{.02(1.5036303)} \right] \Rightarrow$$

$$Pv = 4050.61 \left[ 50 - \frac{1.3159318}{.03007261} \right] \Rightarrow$$

$$Pv = 4050.61 \left[ 50 - 43.758483 \right] \Rightarrow$$

$$Pv = 4050.61 \left[ 6.241517 \right] \Rightarrow$$

$$Pv = 25,281.95$$

From the present value of $25,281.95, I must deduct the lump-sum attorneys' fee, which in this case is 33%, or $8,343.04. I subtract that amount from the $28,354.27 to be annuitized. That leaves $20,011.23 actually to be paid out over seven years. Following the procedure just described, the present value of an annuity that will pay that amount is $17,842.94.

The same procedure will also provide the present value of an annuity paying $53,943.17 over twenty-six years.[10] The present value is $40,517.94. One-third of that amount is $13,370.92, which I subtract as a lump-sum attorneys' fee from the amount to be annuitized. That leaves $40,572.25 to be paid out over twenty-six years. The present value of that annuity is $30,474.68.

While the Court must enter judgment in the forgoing amounts, I direct the parties to CPLR § 5041(f). That subdivision allows the parties to vary the statutory payment terms, which the parties should seriously consider given the relatively small amounts due as annuities. Prompt payment of the present value of the annuities would obviously benefit the plaintiff but would also benefit the defendant in relieving it of the other obligations imposed by the structured judgment statute. *See, e.g.,* CPLR § 5043 (posting security).

### G. *Summary*

To summarize, the Court will enter a lump sum judgment for $1,180,900 in past non-economic losses, $61,793.82 in past economic losses, $250,000 in future economic losses, and an additional $21,713,96 in attorneys' fees on the award of future damages. This sums to $1,514,407.78. The Court will also enter judgment for the present value of the annuity contracts, or $48,317.62. The Clerk is directed to add post-verdict, pre-judgment interest at the state statutory rate to this "total sum awarded" of $1,562,725.40. *See* CPLR § 5002. The defendant and its insurers are directed to offer and to guarantee the purchase and payment of annuity contracts as set forth earlier in this opinion and in compliance with the requirements set forth in Article 50–B of the New York Civil Practice Law and Rules.

**10.** The jury assessed these damages over 25.7 years. For the sake of simplicity, I have rounded that to 26 years.

## LEWIS

The Lewis case is more straightforward, as it does not implicate Article 16 or the annuity provisions of CPLR § 5041. Except for this important difference, I calculate the *Lewis* judgment using the same methodology as I did *McPadden.*

In *Lewis*, the jury returned the following verdict:

| Type | Jury award |
| --- | --- |
| Medical expenses | $ 27,795.30 |
| Funeral expenses | 2,000 |
| Lost services | 8,000 |
| Pecuniary loss/past | 30,000 |
| Pain and suffering | 1,250,000 |
| Consortium/non-economic | 365,000 |

The total award was thus $1,682,795.30. The jury also found Keene's equitable share of the damages to be 9%. The Court must add interest to the wrongful death elements of this award. Adding 9% interest increases these awards as follows:

| Medical expenses | $47,836.38 |
| --- | --- |
| Funeral expenses | $ 3,538.29 |
| Pecuniary losses | $39,356.34 |

This increases the total award to $1,713,731.01.

As the defendant has not opposed the plaintiff's recitation of the factual predicates necessary to this adjustment (such as the date on which Mr. Lewis became symptomatic) and as the plaintiff's recitation finds support in the evidence, I have accepted those facts as the basis for this calculation.

Thus, for funeral expenses, interest runs between the date of death, November 23, 1985, and the date of the verdict, March 13, 1992. For medical expenses, interest runs from the reasonable intermediate date between the time of first becoming symptomatic and death, August 1, 1985, and the date of the verdict. And interest runs on pecuniary losses to survivors from the reasonable intermediate date between death and the verdict. Against this amount, the Court must set off the settlements. Gen. Oblig.Law § 15–108(a).

The following table shows settled parties, the amount for which they settled, and their equitable shares as determined by the jury (asterisks denote the greater of the amount of the settlement or the equitable share):

| Party | Settlement amount | % Liability |
| --- | --- | --- |
| Babcock & Wilcox | 5,000* | 0 |
| CCR | 110,000 | 7.5* |
| Combustion Engineering | 50,000* | 2 |
| Empire Ace | 50,000* | 1.5 |
| Fibreboard | 188,692.72* | 2 |
| Garlock | 9,000 | 1.5* |
| Owens–Corning | 650,000* | 9 |
| Owens–Illinois | 250,000* | 9 |
| Pittsburgh Corning | 150,000* | 1 |
| Rock Wool | 0 | 1.5* |
| U.S. Mineral | 25,000 | 5.5* |
| W.R. Grace | 0 | 2* |

For reasons stated earlier, Keene is not entitled to use the defendant-by-defendant method of setting-off. If it did, it would owe a mere $61,566.71, whereas its equitable share of the $1,713,731.01 adjusted verdict is $154,235.79. *See Williams v. Niske, supra.* Accordingly, I set off using the aggregate method. Here, the dollar value of the settlements—$1,487,692.72—exceeds the jury's apportionment of liability to settlors—42.5% of the verdict, or $728,335.68. Subtracting this greater amount from the adjusted verdict leaves $226,038.29. Keene is jointly and severally liable for this amount.

The Court will enter judgment for this amount. The Clerk is directed to add post-verdict, pre-judgment interest to this

amount at the state statutory rate. *See* CPLR § 5002.

In calculating this amount, the Court has given Keene credit for the equitable shares assigned to parties against whom the plaintiff voluntarily discontinued this action. The Appellate Division, Second Department, required this result in *Killeen v. Reinhardt*, 71 A.D.2d 851, 419 N.Y.S.2d 175, 178 (2d Dept.1979). Other federal and state courts have looked to this portion of *Killeen* to guide their decisions. *See, e.g., Apple*, 829 F.2d at 331; *BNY*, 772 F.Supp. at 1394.

Keene also challenges the reliability of the disclosure of settlements by plaintiff's counsel. In particular, defendant argues that Phillips has failed to disclose the identity of all settling parties. Defendant's argument initially grew out of a comparison between a list of settling defendants appended to a November 1, 1991 letter written by counsel Phillips and the list of settlors that Phillips submitted for the purpose of molding the verdict. Keene, relying on the November 1 letter, voiced its suspicion about the completeness of the list provided by Phillips. Phillips then submitted a reply affidavit in which he stated that "there has been no settlement" with, among others, Babcock & Wilcox and that the November 1 letter was "prepared as a draft, in haste," and is "inaccurate." Keene's suspicion only deepened, however, when it discovered other evidence that the plaintiff had settled with Babcock & Wilcox. Keene also pointed out that it is entitled to a setoff for parties against whom the plaintiff voluntarily discontinued the action and that Phillips failed to identify parties falling into that category. Phillips now claims that his omission of Babcock & Wilcox was an oversight and admits that the plaintiff has indeed settled with that company.

While I understand the basis for Keene's concern, it presents no reason to delay entry of a judgment. The Court has directed plaintiff's counsel to provide information identifying all settlors and parties against whom the action has been discontinued. If this information later proves inaccurate, Keene may move not only to vacate the judgment but also for sanctions against plaintiff's counsel.

Keene also objects that the Court must "reallocate" the equitable shares that the jury attributed to bankrupts and other nonparties to all defendants, settlors and nonsettlors alike. As mentioned, Judge Weinstein treated this issue at some length. He found:

"Section 15–108 provides that deductions may be made under certain circumstances for the greater of the amount received by the plaintiff in settlement or the settlor's equitable share. The statute does not provide for further reductions in plaintiffs' verdicts."

*BNY*, 772 F.Supp. at 1400, *aff'd*, 971 F.2d 831. I join in his reasoning. *See id.* at 1399–1403.

Defendant also requests disaggregation of the various Center for Claims Resolution (CCR) defendants—Armstrong, GAF, National Gypsum, and U.S. Gypsum. These companies have formed an association that endeavors to collectively settle asbestos lawsuits. When that association agrees to and pays a settlement, it does not break that settlement down on a company-by-company basis.

Given this arrangement, the release runs directly to the CCR and only indirectly to the CCR's constituent companies. On these papers, defendant has failed in meeting its burden of demonstrating the existence of releases with regard to the individual CCR companies. *See St. Clare's Hosp.*, 499 N.Y.S.2d at 911, 490 N.E.2d at 830.

The Clerk is directed to mail a copy of the within to counsel for defendant and to plaintiff's counsel who is directed forthwith to make distribution to all parties.

SO ORDERED.