OPINION OF THE COURT
Meyer, J.
 Involved in this appeal are questions of vicarious liability of a physician operating a clinic and of the effect with respect to a successive tort-feasor of a release given to the original tort-feasor. As to the first, we conclude that a physician who owns a medical clinic which is held out to the public as offering medical services may be held vicariously liable for the malpractice of a treating doctor even though the owner-physician neither participates in nor controls the diagnosis made or treatment prescribed. As to the second, we hold that General Obligations Law § 15-108 (a) imposes upon the plaintiff who releases the original tort-feasor the burden of proving the extent to which his release reduces his claim against a hospital or physician who through malpractice aggravates the original injuries. The order of the Appellate Division should, therefore, be modified and the case remitted to Supreme Court, New York County, for a further hearing on the effect of plaintiff’s release of the original tort-feasors and, as so modified, should be affirmed, with costs to plaintiff against defendant Bono and costs to defendant St. Clare’s Hospital against plaintiff.
I
Plaintiff Birdell Hill was injured on June 30, 1972, when a sidewalk elevator plummeted some 18 feet into a subcellar, causing pain in his feet, shoulder and wrist. He was taken to St. Clare’s Hospital, where his feet were X-rayed, but was told by the hospital doctors that no bones were broken and that he had suffered "soft tissue injury.” His right ankle was wrapped *76 in an ace bandage and he was given a cane and told to see a "company doctor.”
Some years before, Hill had been a patient at The Benjamin A. Gilbert Medical Clinic, an industrial medical practice then run by Dr. Gilbert, and he had also taken an injured coworker to that clinic for treatment. On the day following his own injury, Hill went to the Gilbert Clinic. The clinic had been run by Dr. Benjamin Gilbert for some 40 years on West 45th Street in Manhattan. Faced with the need for emergency surgery and concerned lest his patients turn to other physicians during his absence, Dr. Gilbert asked defendant Bono, a friend and practicing physician, to use the name Benjamin A. Gilbert Medical Clinic while he was incapacitated. Dr. Bono agreed and began to use the name of the clinic at a suite of offices leased by him on West 44th Street. He also arranged for two secretaries and two physicians (Carranza and De Nalfi) formerly with Dr. Gilbert to move into the West 44th Street offices, where all three physicians treated their own patients as well as those of Dr. Gilbert. Dr. Gilbert never practiced at the West 44th Street office, however, because the ailment which caused his hospitalization proved fatal.
Plaintiff knew none of the clinic doctors by name when he visited the clinic the day following his injury and it is undisputed that he was never seen professionally by Dr. Bono at the clinic or elsewhere. On his first visit he was seen by either Dr. Carranza or Dr. De Nalfi, who looked at his wrist and ankle and requested the hospital X rays. Several days later, after obtaining the hospital X rays and taking a second set of his own, Dr. Carranza applied a cast to plaintiff’s right foot. Plaintiff testified that in addition to the fact that his right foot "looked funny” and was "curved toward the right,” the large toe of his left foot was "sticking up a bit.” He visited the clinic on five or six other occasions through early August, when Dr. Carranza referred him to Dr. Selig Strax.
Dr. Strax testified that plaintiff suffered not only fractures of the second, third and fourth metatarsal bones of his right foot but also a complete dislocation of his left great toe which had not been diagnosed by St. Clare’s Hospital or by either Dr. Carranza or Dr. De Nalfi, that plaintiff’s having attempted to walk on the foot for six or seven weeks following the injury had necessitated surgery and had resulted in a permanent deformity, known as a "hammer toe,” as well as other complications.
*77 Hill and his wife, Mamie, as derivative plaintiff, began lawsuits against the owner and operator of the building in which he was injured, the elevator manufacturer and the manufacturer of the elevator’s gears (hereafter original tortfeasors). Some time thereafter, the present action was separately begun by the same two plaintiffs against St. Clare’s Hospital and Drs. Bono and Carranza,[1] doing business as The Benjamin A. Gilbert Medical Clinic. Prior to trial of the present action the action against the original tort-feasors was settled with respect to both plaintiffs for a total of $57,000. They executed a general release containing no reservation of rights or allocation of damages as between plaintiffs or as to injuries, although the amount paid by each of the contributing defendants was set forth in it. The defendants in the present action were permitted during trial to amend their answers to assert the release as an affirmative defense, and a hearing on the question was held by the Trial Judge pursuant to CPLR 4533-b at which plaintiff testified, the bills of particulars in the prior actions were introduced, and plaintiffs’ attorneys conceded that the claim made against the original tort-feasors included the aggravation of Birdell Hill’s injuries by the present defendants and that the release given was "a release of all claims asserted in the action against them.” The Trial Judge, concluding that the burden of proof was upon defendants to establish what portion of the prior settlement, if any, was for the derivative plaintiff, what portion was for injuries to portions of Birdell Hill’s body not involved in the present action, and what portion was for the present defendants’ aggravation of the original injuries to his left foot, denied any offset for the prior settlement.
At the close of plaintiffs’ case and at the close of the entire case, defendant Bono moved to dismiss on the ground that he had never seen Birdell Hill professionally and that Dr. Carranza was an independent contractor. The motion was denied and the case went to the jury under a charge,[2] to which Dr. *78 Bono excepted, that a clinic which furnishes an independent doctor to perform services at that clinic is responsible for the negligence of that doctor. The jury found in favor of Birdell Hill against both defendants in the amount of $200,000, apportioning liability of 30% to St. Clare’s Hospital and 70% to Dr. Bono, but found in favor of defendants on Mamie Hill’s derivative claim. The Trial Judge ordered a new trial on damages unless Birdell Hill agreed to accept $132,340, which he did, and set aside the defendants’ verdict against Mamie Hill as against the weight of the evidence.[3]
On appeal by defendants to the Appellate Division, that court affirmed, holding unanimously (although by a 3 to 2 split as to the reasons) that denial of any offset for the settlement with the original tort-feasors was proper and, over the dissent of the two of its members, that sufficient evidence had been presented to require submission to the jury of the question of Dr. Bono’s liability for the negligent acts of Dr. Carranza. Defendant Bono both appealed as of right and moved before the Appellate Division for leave to appeal, apparently to obviate any finality question resulting from the stipulation deferring the new trial as to Mamie Hill.[4] We granted St. Clare’s motion so that both defendants involved in the offset issue would be before us. For the reasons that follow, we conclude that the question of Dr. Bono’s liability was properly submitted to the jury but that the courts below erred in holding that defendants bore the burden of proving what was covered by the release given to the original tortfeasors. We, therefore, modify the order of the Appellate Division and remit the case to Supreme Court, New York County, for further hearing on the release issue pursuant to CPLR 4533-b and, as so modified, affirm.
*79 II
A
Although a hospital or other medical facility is liable for the negligence or malpractice of its employees (Bing v Thunig, 2 NY2d 656), that rule does not apply when the treatment is provided by an independent physician, as when the physician is retained by the patient himself (Fiorentino v Wenger, 19 NY2d 407, 414; see, Topel v Long Is. Jewish Med. Center, 55 NY2d 682, 683), unless the hospital knows that the patient is unaware of the dangers and novelty of the medical procedure proposed to be performed (Fiorentino v Wenger, 19 NY2d, at p 417, supra; see, Ann., 12 ALR4th 57). Nor is affiliation of a doctor with a hospital or other medical facility, not amounting to employment, alone sufficient to impute the doctor’s negligent conduct to the hospital or facility (see, Ruane v Niagara Falls Mem. Med. Center, 60 NY2d 908; McDermott v Torre, 56 NY2d 399). Thus, a hospital may not be held for the acts of an anesthetist who was not an employee of the hospital, but one of a group of independent contractors (Holzberg v Flower & Fifth Ave. Hosps., 32 NY2d 716, affg 39 AD2d 526), and when physicians share office space and by agreement service each other’s patients for a shared fee, the malpractice of the treating physician will not be imputed to the absent physician, even though it is the latter who bills for the treatment (Graddy v New York Med. Coll., 19 AD2d 426, 430, mot to dismiss appeal denied 13 NY2d 1175). Likewise, that a physician is a shareholder, officer or employee of a professional service corporation does not make him vicariously liable for the malpractice of another doctor who is an officer, director and employee of the corporation (Connell v Hayden, 83 AD2d 30, 49-59; Business Corporation Law § 1505 [a]).
While vicarious liability for medical malpractice generally turns, therefore, on agency or control in fact (see generally, Ann., 69 ALR2d 305), we have also, in Hannon v Siegel-Cooper Co. (167 NY 244), recognized as a predicate for malpractice liability apparent or ostensible agency (or, as it is sometimes called, agency by estoppel or by holding out). Hannon was an action against a New York City department store which represented and advertised itself as carrying on the practice of dentistry in one of its departments. The department was, in fact, leased to a Mr. Hayes, who employed Dr. Cooney to render professional service in the department. Plaintiff, claiming to have been injured by Dr. Cooney’s negligent and un *80 skillful services, sued the department store and recovered a verdict. The Trial Judge had instructed the jury that: " 'If the defendants in this case made representation to the plaintiff, on which she relied, that they were conducting a dentist business in their store, and if she, because of those, representations, hired the workman in the store of the defendants, with no knowledge that the business was conducted by Mr. Hayes individually, you may find the defendants responsible for the acts of the dentist who treated the plaintiff, even though Mr. Hayes, as a matter of fact, was the real owner of that department of the defendants’ store.’ ” (167 NY, at p 246.) On appeal to us it was argued that apparent agency should not be applied, the action being in tort and not on contract. In affirming we held (167 NY, at p 247) that: "[Wjhenever the tort consists of a violation of a duty which springs from the contract between the parties, the ostensible principal should be liable to the same extent in an action ex delicto as in one ex contractu. It is urged that the representation that the operating dentists were the defendant’s servants did not mislead the plaintiff to her injury and, therefore, should not estop the defendant from asserting the truth. There is no force in this claim. If A contracts with the ostensible agent of B for the purchase of goods, he relies not only on the business reputation of B, as to the goods he manufactures or sells, but on the pecuniary responsibility of B to answer for any default in carrying out the contract. So here the plaintiff had a right to rely not only on the presumption that the defendant would employ a skillful dentist as its servant, but also on the fact that if that servant, whether skillful or not, was guilty of any malpractice, she had a responsible party to answer therefor in damages.”
The principle of the Hannon case is accepted in both the Restatement (Second) of Agency § 267,[5] and the Restatement (Second) of Torts § 429.[6] It has been applied to hold a hospital *81 or clinic responsible to a patient who sought medical care at the hospital or clinic rather than from any particular physician although the physician whose malpractice caused injury to the patient was not an employee of the hospital or clinic, by both New York courts (Lanza v Parkeast Hosp., 102 AD2d 741; Rivera v Bronx-Lebanon Hosp. Center, 70 AD2d 794; Heinsohn v Putnam Community Hosp., 65 AD2d 767; Mduba v Benedictine Hosp., 52 AD2d 450; Magwood v Jewish Hosp. & Med. Center, 96 Misc 2d 251; see, Felice v St. Agnes Hosp., 65 AD2d 388; see also, 1 NY PJI2d 396 and PJI 2:255) and the courts of other States (see, e.g., Seneris v Haas, 45 Cal 2d 811, 291 P2d 915; Mehlman v Powell, 281 Md 269, 378 A2d 1121; Howard v Park, 37 Mich App 496, 195 NW2d 39; Stratso v Song, 17 Ohio App 3d 39, 477 NE2d 1176; Adamski v Tacoma Gen. Hosp., 20 Wash App 98, 579 P2d 970).
B
Applying those principles, we conclude that there was sufficient evidence to require submission to the jury of the questions, set forth in note 2 above, whether Dr. Bono was the owner of The Benjamin A. Gilbert Medical Clinic and held the clinic out as offering medical services to the public through any of the physicians practicing in it. As noted above, plaintiffs prior relationship was with the clinic rather than any of the three physicians, and he did not ask to see any particular physician. The report to the Workers’ Compensation Board was signed in Dr. Bono’s name individually, the bill submitted for the services rendered to plaintiff bore the name of the clinic, over which was typed Dr. Bono’s name, and payment was made to Dr. Bono. Dr. Bono testified that he owned the practice known as The Benjamin A. Gilbert Medical Clinic, that the clinic rendered medical services to patients in much the same way as a hospital clinic and that a patient would go "because you know you’re going to be rendered medical service” and because "there was a medical service available on 45th Street to go to.” There was a checking account in the name of the clinic on which only Dr. Bono had the right to draw checks and into which all payments for services rendered by Dr. Bono, or by either of the other doctors when the person served was not a "personal patient [of his] and had just *82 come to the clinic,” were deposited. Dr. Bono would write weekly checks on that account of $400 to each of Drs. Carranza and De Nalfi as their "draw.” Fees for clinic patients, as distinct from personal patients of the other two doctors, were set by Dr. Bono. Office hours were divided among the three doctors whose names together with the name of the clinic were on its door. If a patient wished to see a particular doctor, he or she would have to make an appointment; if no specific doctor was requested, the patient would be seen by the physician in attendance when the patient came in.
There was, to be sure, contradictory evidence from Dr. Bono concerning his relationship with the other two doctors, the reason for his name on the report and the bill and the reason for the draw of the other two doctors, among other things, but in determining whether the evidence was sufficient to go to the jury we consider only whether on the evidence taken in the light most favorable to plaintiff a prima facie case has been made out, not the weight of the evidence (Alexander v Eldred, 63 NY2d 460, 464; Cohen v Hallmark Cards, 45 NY2d 493, 499). Here, unlike the situation in Graddy v New York Med. Coll, (supra), on which defendant Bono so heavily relies, there was evidence from which the jury could find that Dr. Bono owned the clinic and that plaintiff accepted Dr. Carranza’s services in reliance not upon Dr. Carranza’s skill or competence but upon the fact that his services, whatever in fact his relationship with the clinic, were offered by the clinic. On the question of Dr. Bono’s liability, therefore, we agree with the courts below.
Ill
As to the effect of plaintiffs’ release of the original tortfeasors, however, the courts below erred.
The original tort-feasors were liable not only for the injuries incurred by Birdell Hill as a result of the elevator’s fall but also for the aggravation of those injuries through the malpractice of St. Clare’s Hospital as well as the malpractice of Dr. Carranza for which Dr. Bono has been determined to be responsible (Milks v McIver, 264 NY 267; see, Matter of Parchefsky v Kroll Bros., 267 NY 410; PJI 2:305) and St. Clare’s Hospital is responsible not only for its aggravation of the original injuries but also for any aggravation of the injuries inflicted by it through the malpractice of Dr. Carranza (id.). Such liability is, however, successive rather than joint *83 and the injured plaintiff cannot recover the same damages twice (id.; Derby v Prewitt, 12 NY2d 100, 105). It follows that an original wrongdoer held for all of the damages incurred by the person injured is subrogated to the latter’s right to recover from the physician for the damages caused by his or her malpractice (Matter of Parchefsky v Kroll Bros., supra; Matter of Roach v Hastings Plastics Corp., 57 NY2d 293, 297; see, Ann., 8 ALR3d 639) and that if the injured person recovers first from the physician, he may not thereafter recover from the original tort-feasor for the malpractice aggravation (Matter of Parchefsky v Kroll Bros., 267 NY, at p 414, supra).
The common-law rule was that release of the original wrongdoer barred an action against a hospital or physician for the additional injury or damages resulting from the latter’s unskillful treatment of the original injury (Malvica v Blumenfeld, 28 NY2d 851; Milks v McIver, 264 NY, at p 271, supra), except where the injured party was unaware of the malpractice aggravation at the time the release was signed (Derby v Prewitt, supra). That rule was abrogated, however, in 1972, when at the suggestion of the Law Revision Commission (1972 NY Legis Doc No. 65 [K], reprinted at 1972 McKinney’s Session Laws of NY, at 3237-3239) General Obligations Law § 15-108 enacted the rule that a release "given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death * * * does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors”. Under the present wording of General Obligations Law § 15-108 (a), such a release "reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor’s equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.”
The reference to "two or more persons liable or claimed to be liable in tort for the same injury” covers successive as well as joint tort-feasors, as the Law Revision Commission report emphasizes by reference to Milks v McIver (supra; 1972 McKinney’s Session Laws of NY, at 3237) and as was held in Roma v Buffalo Gen. Hosp. (103 AD2d 606). Nothing in the General Obligations Law or in CPLR article 14 allocates the burden of proof, however, and while "release” and "payment” *84 are affirmative defenses required by CPLR 3018 (b) to be pleaded by a successive tort-feasor seeking to take advantage of the reduction allowed by General Obligations Law § 15-108, the burden of proof is not a necessary concomitant of the burden of pleading (Lavine v Indemnity Ins. Co., 260 NY 399, 410; Glogvics v Preferred Acc. Ins. Co., 245 App Div 817; see, Rushing v Commercial Cas. Ins. Co., 251 NY 302). Thus the burden of proof as to the validity of a release is on the defendant who pleads it (Fleming v Ponziani, 24 NY2d 105), but a releasor who seeks to limit the effect of a release because of a claimed mutual mistake has the burden of proof on that issue (Mangini v McClurg, 24 NY2d 556, 563).
It is the latter concept which we applied in Derby v Prewitt in holding on "considerations of reason and basic fairness” (12 NY2d, at p 106, supra) that plaintiff had the burden of proving "whether the plaintiffs settlement with the taxicab driver did actually constitute satisfaction of all damages caused by his wrong or was intended as such. If it did, or was so intended, no claim remained against the doctor” (see also, Rask v County of Nassau, 24 AD2d 580; Retzel v State of New York, 94 Misc 2d 562; 1 NY PJI2d 658). The considerations of reason and fairness involved were recently expounded upon in an analogous context in Weinberg v Transamerica Ins. Co. (62 NY2d 379, 383). Paraphrased to fit the present situation, Weinberg’s explanation was that "the normal allocation of the burden of proof must give way in this instance, however, to the practicalities of the situation and to a realistic evaluation of the relative positions of the” parties, for it is the injured person "who participates in and can control the fashioning of the terms of the settlement” with the original wrongdoer, a procedure in which the successive wrongdoer has no part. Indeed, unless the injured party is required to bear that burden, the possibility of his or her double recovery for the same damages looms large.
There is, however, a material difference between what Derby required plaintiff to prove — what was intended — and what must be proved under General Obligations Law § 15-108. Under subdivision (a) of that section, the claim of the releasor is reduced by the greatest of (1) the amount stipulated by the release, (2) the amount of the consideration paid for it, or (3) the released tort-feasor’s equitable share of the damages. To the extent that the injured party and the original tort-feasor are permitted to stipulate the amount by which the liability of the successive tort-feasor is to be reduced by the original tort *85 feasor’s payment, intent remains a factor, but the amount stipulated must also be shown to have been arrived at in good faith (cf. General Obligations Law § 15-108 [b]). The reference in the subdivision to the amount paid for the release may have been inserted because releases so often recite only that they have been given "for one dollar and other good and valuable consideration.” But even if a substantial sum is recited, the consideration stated may be less than the amount paid in fact. Proof that it is not thus bears on good faith as well.
The third criterion — the released tort-feasor’s equitable share of the damages — involves a seeming contradiction, however. Under CPLR 1402 "equitable shares shall be determined in accordance with the relative culpability of each person liable” for contribution. But, as we have seen, the original tort-feasor’s right to recover from the successive malpracticing doctor or hospital arises by way to subrogation to the rights of the injured party, and is a right to complete indemnity, rather than contribution, for the aggravation damages. When the two statutes are read together in the light of their respective legislative histories,[7] it is, however, clear that the equitable share of the released tort-feasor under General Obligations Law § 15-108 is to be determined not by assessing the wrongful acts committed by each but by assessing the damage inflicted by each (cf. Riviello v Waldron, 47 NY2d 297, 305-307; Roma v Buffalo Gen. Hosp., supra; and see, Rock v Reed-Prentice Div., 39 NY2d 34; Lasprogata v Qualls, 263 Pa Sup Ct 174, 397 A2d 803). Thus, for purposes of General Obligations Law § 15-108, "contribution” in CPLR 1402 must be read as including the released tort-feasor’s right as subrogee to complete indemnity.
A further hearing pursuant to CPLR 4533-b must, therefore, be held by the Trial Judge. The object of the hearing will be to determine what portion of the settlement payment by the original tort-feasors was for the original injuries and what portion was for the aggravation injuries. (In the present action, in which only the subsequent tort-feasors are defendants, damages have been awarded for the injuries they caused — the aggravation injuries.) Any portion of the settlement payment found to be attributable to the aggravation injuries must be offset against plaintiffs’ recovery against *86 defendants on the principle that plaintiffs cannot recover for the same aggravation injuries both from the original tortfeasors and the defendants in this action and it will be plaintiffs’ burden to prove what portion of the settlement payment was for the aggravation injuries.
At the contemplated hearing, the trier of fact will first determine the amount paid to plaintiffs in settlement by the original tort-feasors, which may or may not be the amount recited in the release. Next, he will allocate that amount between the two plaintiffs, based upon the reasonable intent of the parties. Third, the fact finder should determine what portion, if any, of the settlement payment should be attributed to each plaintiff’s aggravation damages. In so doing he will consider the statement as to allocation, if any, between original and aggravated injuries contained in the settlement documents and the gravity of the respective injuries and determine whether the amount allocated by the parties was arrived at in good faith. Finally, if as to either plaintiff the fact finder allocates any portion of the settlement payment to the aggravation injuries, he should deduct that portion from the damages awarded that plaintiff and direct that judgment be entered for the difference. The resultant amount will then be apportioned, as found by the jury, 30% to St. Clare’s Hospital and 70% to Dr. Bono.
Accordingly, the order of the Appellate Division should be modified and the case remitted to Supreme Court, New York County, for a further hearing in accordance with this opinion and, as so modified, should be affirmed, with costs to plaintiff against defendant Bono and costs to defendant St. Clare’s against plaintiff. The certified question is not answered as unnecessary.
Chief Judge Wachtler and Judges Simons, Kaye and Ti-tone concur; Judges Alexander and Hancock, Jr., taking no part.
Order modified, etc.

. Defendant Carranza defaulted but the action as to him was dismissed because plaintiffs waited until trial (more than a year after default) to move for entry of judgment (CPLR 3215 [a], [c]).

. The jury was told that as to Dr. Bono the issues for its decision were: "Was Dr. Rudolph Bono the owner of the Benjamin Gilbert Medical Center? Did the Gilbert Medical Center furnish medical treatment to the plaintiff, as distinguished from Dr. Carranza and Dr. DeNalfi, individually, independent from Dr. Bono, treating the plaintiff? Did the Gilbert Medical Center commit negligence or medical malpractice? If so, was this medical malprac *78 tice, if any, a proximate contributing cause to any enhanced or aggravated injuries you find the plaintiff may have sustained?”

. The ruling as to Mamie Hill is not before us, the parties having stipulated to defer trial of the damage issue as to her until determination of the present appeal.

. The Appellate Division granted leave to Bono and certified the question whether the judgment of Supreme Court as affirmed by it was properly made. Birdell Hill having stipulated to the reduced damages, there is party finality. Accordingly, we do not answer the certified question because unnecessary.

. That section provides: "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.”

. That section, adopted in reliance in part on the Hannon case (see, Reporter’s Notes, Restatement [Second] of Torts, Appendix §§ 402A to 503, at 91), states that: "One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to *81 liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.”

. CPLR article 14 covers successive as well as joint tort-feasors (Twentieth Ann Report of NY Judicial Conference, 1975, at 214, 223).