Jarek Tylenda MOLLER, Plaintiff,

v.

NORTH SHORE UNIVERSITY HOSPITAL, its agents, servants and employees, and Doctor David Levine, individually, Defendants.

No. CV 90–3886 (ADS).

United States District Court, E.D. New York.

Sept. 18, 1992.

Bernstein & Schwartz, New York City (Laurence Bernstein, Jeffrey Schwartz, of counsel), for plaintiff.

Keller, O'Reilly & Watson, P.C., Uniondale, N.Y. (Scott E. Watson, of counsel), for defendant North Shore University Hosp.

Heidell, Pittoni, Murphy & Bach, P.C., New York City (Elizabeth Cornacchio, of counsel), for defendant Dr. David Levine.

## MEMORANDUM AND ORDER

SPATT, District Judge.

The issue in this medical malpractice action is the legal effect on successive medical tortfeasors of two prior separate settlements involving the original tortfeasors.

Counsel for both defendants in this action have moved and cross-moved, pursuant to Fed.R.Civ.P. 56, for summary judgment on the amended complaint. The Court heard oral argument of the motions on August 14, 1992, at which time the matter was set down for a hearing, pursuant to Fed.R.Civ.P. 43(e), for August 31, 1992, at 9:30 a.m. Rule 43(e) provides as follows:

"**(e) Evidence on Motions.** When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition."

In the order issued on August 14, 1992, the Court stated that the purpose of the hearing would be "to determine whether the plaintiff's settlement in the state court action constituted or was intended to constitute a satisfaction of all damages in this case." More accurately, the hearing was to determine whether either or both of the plaintiff's two separate settlements constituted or were intended to constitute a satisfaction of all damages in this case.

## FACTUAL BACKGROUND

According to the affidavits and memoranda submitted in this summary judgment motion, the conceded facts are as follows: the plaintiff in the instant malpractice action is a 21–year–old Swedish national who came to the U.S. in June 1988 and worked as a waiter at Squire's Restaurant in Great Neck for three days until he was seriously injured in an automobile accident on September 18, 1988. At the time of the accident, the plaintiff was a passenger in a car operated by one Richard Treulieb, who was driving the plaintiff and a co-worker home from a party at which they had been working. Treulieb's car struck a utility pole; the vehicle split in half and Moller was ejected from the back seat.

The plaintiff sustained serious injuries and was treated as a trauma patient at North Shore University Hospital. Moller was taken to North Shore University Hospital emergency room, where the defendant Dr. David Levine was called in to evaluate the plaintiff as a trauma patient. A physical examination and various laboratory tests and x-rays were taken, and based on the results, Moller was taken to the operating room at 2:20 a.m., at which time, Dr. Levine performed an exploratory laparotomy, assisted by a Dr. Kerner.

The laparotomy revealed a lacerated spleen, two lacerations of the right lobe of the liver, a tear of the ascending colon and another tear of the transverse colon, and a hematoma at the base of the ascending colon mesentery. The plaintiff then underwent a splenectomy and further surgery to repair the other injuries. According to the hospital reports, the operation lasted ap-proximately one and one-half hours and plaintiff was sent to the recovery room at 4:45 a.m. Significantly, the plaintiff was noted to have movement of all extremities postoperatively.

At 6:45 a.m., a repeat chest x-ray was taken and a possible laceration of the aorta was detected. A thoracic angiogram was performed and based on the results, the patient was returned to the O.R. where Dr. Michael Hall, a vascular surgeon, performed a left thoracotomy and repaired the aortic tear. This procedure lasted approximately four and one-half hours and was stated to be "uncomplicated."

Postoperatively, on October 1, 1988, the plaintiff was noted to have "decreased motor strength of his lower extremities bilaterally." Subsequent neurology and urology consultations and tests resulted in a diagnosis of "anterior spinal artery syndrome, which resulted in paraparesis of plaintiff's lower extremities and a neurogenic bladder and bowel." Paraparesis is defined in *Stedman's Medical Dictionary*, Fourth Edition, as "a slight degree of paralysis, affecting the lower extremities." Neurogenic is defined as "originating in or starting from, or caused by, the nervous system or nerve impulses."

On October 20, 1988, approximately 32 days after the accident, Moller was discharged from North Shore Hospital in stable condition and was transferred to the Rusk Institute of Rehabilitative Medicine at NYU, where he remained until February 23, 1989, a period of four months, and then returned to his native Sweden.

While Moller was still in North Shore Hospital, in October, 1988, his attorney commenced a negligence suit in Supreme Court, Queens County against the defendants Treulieb, Squire Catering, and a Mr. Daniels, the host of the party, seeking thirty million dollars in damages.

In January, 1989, the plaintiff settled with the defendant Treulieb and executed both a general release and stipulation of discontinuance with prejudice as to Treulieb. In that document, the plaintiff reserved all of his rights with respect to the remaining defendants, namely, Squire Ca-

tering and Daniels. In consideration for the general release to Treulieb, Moller received the sum of $250,000, which was the full amount of the insurance coverage by Hanover Insurance Company on the Treulieb motor vehicle.

The case against the remaining two defendants, Squire Catering and Daniels, went to trial in Supreme Court, Queens County in April 1990. The trial was bifurcated. At the conclusion of the plaintiff's case on liability, the complaint was dismissed against the defendant Daniels. The jury rendered a liability verdict of 60% against the driver Treulieb and 40% against the defendant Squire Catering.

During the damages phase of the trial, the plaintiff's attorney produced Dr. Nathanial Shafer, a physician board certified in neurology and internal medicine, who testified that the plaintiff had permanent paralysis of the lower extremities and a permanent neurogenic bowel and bladder. After the plaintiff's medical expert testified but before the issue of damages was given to the jury, the case was settled as against the defendant Squire Catering by the Public Service Mutual Insurance Co. for $475,000. The maximum insurance coverage was $500,000.

Pursuant to an agreement entered on the record, the parties, on April 24, 1990, entered into a stipulation of discontinuance with prejudice and a general release was executed in favor of Squire Catering. Neither document reserved any right on the part of the plaintiff to proceed against any other potential defendants.

In November, 1990, seven months after the negligence suit was settled as against the defendant Squire Catering, the plaintiff commenced the present medical malpractice action against the defendants Dr. David Levine and North Shore University Hospital.

The defendant Dr. David Levine was previously granted permission to amend his answer to include the affirmative defense that this action is barred by reason of the plaintiff's having received "complete compensation" for his injuries by virtue of his settlement with the actual, original tortfeasors who are not parties to the present action. The defendant North Shore Hospital was permitted to amend its answer to assert the same defense as well as a second affirmative defense, namely, that the plaintiff's recovery against the Hospital, if any, shall be set off and reduced by any amount of money or compensation the plaintiff received by settlement or judgment rendered in the prior legal proceeding.

## APPLICABLE STANDARD

The Court has previously outlined the law of summary judgment as it relates to the motions made by the defendants in this case. Before deciding those motions, the Court scheduled the instant hearing on the issue of the legal effect of the two prior settlements in the state court.

The New York Court of Appeals has held that N.Y. General Obligations Law § 15-108(a) imposes upon the plaintiff "who releases the original tort-feasor the burden of proving the extent to which his release reduces his claim against a hospital or physician who through malpractice aggravates the original injuries" (*Hill v. St. Clare's Hospital*, 67 N.Y.2d 72, 499 N.Y.S.2d 904, 906, 490 N.E.2d 823, 825 [1986]). In *Hill*, the plaintiff was injured when a sidewalk elevator plummeted some 18 feet into a subcellar, causing pain in the plaintiff's feet, shoulder and wrist (*id.*). He was x-rayed at St. Clare's Hospital, but was told by the doctors that he had not broken any bones and that he suffered "soft tissue injury" (*id.*). The emergency room personnel wrapped his ankle, gave him a cane, and told him to see a "company doctor" (*id.*).

The plaintiff in *Hill* visited a clinic five or six times during the next two months and was eventually referred to a specialist who diagnosed fractures of the second, third and fourth metatarsal bones of his right foot and a complete dislocation of his left great toe which had not been diagnosed at St. Clare's Hospital nor at the clinic. Hill then brought suit against the owner of the building where he was injured, the elevator manufacturer and the manufacturer of the elevator's gears, the

original tortfeasors, but not the doctors or the hospital.

Some time thereafter, a separate medical malpractice action was commenced. There were two separate actions then outstanding. Prior to the trial of the malpractice action, the lawsuit against the original tortfeasors was settled for $57,000. A general release was signed containing no reservation of rights or allocation of damages as to injuries, although the amount paid by each of the contributing defendants was set forth (*id.* 499 N.Y.S.2d at p. 907, 490 N.E.2d at p. 826). The defendant physicians and St. Clare's Hospital were permitted to amend their answers to assert the release as an affirmative defense.

As the Court of Appeals noted:

"... at a hearing ... pursuant to CPLR 4533–b at which plaintiff testified, the bills of particulars in the prior actions were introduced, and plaintiffs' attorneys conceded that the claim made against the original tort-feasors included the aggravation of [plaintiff's] injuries by the present defendants and that the release given was 'a release of all claims asserted in the action against them.' The Trial Judge, concluding that the burden of proof was upon defendants to establish ... what portion was for injuries to portions of [plaintiff's] body not involved in the present action, and what portion was for the present defendants' aggravation of the original injuries to his left foot, denied any offset for the prior settlement" (*Hill, supra,* 499 N.Y.S.2d at p. 907, 490 N.E.2d at p. 826).

On appeal, the Appellate Division, First Department affirmed the trial court. However, the New York Court of Appeals modified the decision and remitted the case to the Supreme Court, noting: "we conclude that ... the courts below erred in holding that defendants bore the burden of proving what was covered by the release given to the original tort-feasors" (*id.* 499 N.Y.S.2d at p. 908, 490 N.E.2d at p. 826).

Original tortfeasors are liable not only for the injuries incurred by a plaintiff, but also for the aggravation of those injuries caused by a treating physician (*see*

*Milks v. McIver,* 264 N.Y. 267, 190 N.E. 487 [1934]). Such liability, however, is successive rather than joint, and the injured plaintiff cannot recover the same damages twice (*Hill v. St. Clare's Hospital, supra,* 499 N.Y.S.2d at p. 910, 490 N.E.2d at p. 829; *Derby v. Prewitt,* 12 N.Y.2d 100, 236 N.Y.S.2d 953, 187 N.E.2d 556).

This Court also finds persuasive the recent decision of Justice Ira Gammerman in *Lilly v. N.Y. City Health & Hospitals Corp.,* IAS Part 27, *NYLJ,* April 21, 1992. In that case the plaintiff, who had fallen in the stairway of the building where he lived, sued the owner of the building. Seven years later, the plaintiff settled the case and signed a general release to the landlord, reserving his rights against any other parties. Two months later, the family brought an action against the N.Y.C. Health and Hospitals Corp. alleging that the improper care of the plaintiff resulted in permanent neurogenic damage. In that decision, Justice Gammerman noted the following:

"General Obligations Law 15–108 provides that a release 'given to one or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death ... does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms *expressly so provide*'" (emphasis supplied).

General Obligations Law 15–108 has been held to cover successive as well as joint tortfeasors (*see Hill v. St. Clare's Hospital, supra; Utter v. South Brookhaven Obstetric & Gynecologic Associates,* 135 A.D.2d 811, 522 N.Y.S.2d 915 [2d Dept. 1987]). Since the present defendants themselves concede that they are successive tortfeasors, General Obligations Law 15–108 applies.

Furthermore, General Obligations Law 15–108 applies whether or not a successive tortfeasor was a party to an action brought by the plaintiff at the time he/she released the original tortfeasor (*see Mitchell v. New York Hospital,* 61 N.Y.2d 208, 215, 473 N.Y.S.2d 148 [1984]). General

Obligations Law 15–108 permits a plaintiff to settle with a defendant without risking the discharge of other potentially liable tortfeasors (*id.*).

■ However, General Obligations Law 15–108 does permit a successive tortfeasor to take advantage of the reduction and to assert affirmative defenses of release and payment. Subsection (a) of the statute provides that the release of one tortfeasor

"reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release . . . or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article 14 of the civil practice law and rules, whichever is the greatest."

■ Based upon the law in this area, the plaintiff has the burden of proving whether the plaintiff's successive settlements with the driver Treulieb and the employer Squire Catering "did actually constitute satisfaction of all damages caused by his wrong or was intended as such" (*Hill v. St. Clare's Hospital, supra,* 499 N.Y.S.2d at p. 911, 490 N.E.2d at p. 830). *If it did, or was so intended, no claim remains against Dr. Levine and North Shore Hospital* (*id.* 499 N.Y.S.2d at p. 911, 490 N.E.2d at p. 830; *see Rask v. County of Nassau,* 24 A.D.2d 580, 262 N.Y.S.2d 56) (emphasis supplied). While settlement may be raised as a defense in a subsequent action, when the settling party seeks to limit its effect in such a subsequent action, the burden is on him "to establish why and to what extent the *settlement should be accorded less than its apparent full effect*" (*Carter v. State,* 139 Misc.2d 423, 528 N.Y.S.2d 292, 296 [N.Y.Ct. Cl.1988]) (emphasis supplied).

### THE AMENDED COMPLAINT

The claimed aggravation is clearly set forth in the amended complaint. Paragraph 20 of the original complaint reads as follows:

"Following the performance of the repair and resection of the thoracic artery, the plaintiff sustained paraparesis of the lower extremities and a neurogenic bladder."

Paragraph 20 of the amended complaint which now governs this case, reads as follows:

"*TWENTIETH:* As a direct result of the failure of the defendants to properly diagnose the laceration of plaintiff's thoracic aorta, said defendants aggravated the injuries sustained by plaintiff, and further, directly caused plaintiff to sustain papaparesis (sic) of the lower extremities and a neurogenic bladder."

The injuries caused by the aggravation, as alleged by the plaintiff in the amended complaint, are set forth in that paragraph, namely, paraparesis of the lower extremities and a neurogenic bladder.

Therefore, it is clear that the alleged aggravation of the original injuries occurred shortly after the plaintiff's admission to the North Shore Hospital on September 18, 1988 or September 19, 1988 at the hospital, namely when the first and/or second operations were performed at 2:20 a.m. and 6:45 a.m. that day. There is no evidence that the aggravating acts of malpractice by Dr. Levine or the hospital occurred any later than September 19, 1988. These occurrences, of course, were prior to the institution of both lawsuits in which these defendants were not parties, and prior to both settlements.

Further, the paraparesis and neurogenic conditions were apparent while the plaintiff was a patient in both the North Shore Hospital and at the Rusk Institute. All of this was known to plaintiff and presumably to his counsel prior to the institution of the lawsuits in which these defendants were not parties, and prior to both settlements.

### ISSUES

■ The New York Court of Appeals has provided particularly appropriate guidance in this area of the law. In *Hill v. St. Clare's Hospital, supra,* Judge Meyer set forth the schematic for the type of hearing which should be undertaken to resolve this kind of issue. The object of this hearing, among other things, is to determine what

portion of the settlement payment by the original tortfeasors was for the original injuries and what portion, if any, was for the aggravation injuries (*see Hill*, 499 N.Y.S.2d at p. 912, 490 N.E.2d at p. 831). Since the plaintiff cannot recover for the same aggravation injuries both from the original tortfeasors and the successive tort-feasor defendants in this action, it is the plaintiff's burden to prove whether the settlement payments were for the original injuries only or, if the settlement included payment for the aggravation of the injuries by Dr. Levine and the North Shore Hospital.

Also, the Court must determine whether either settlement contemplated and included both the original injuries and *all* of the aggravated injuries allegedly incurred by the malpractice of Dr. Levine and the hospital. In the latter event, the plaintiff would be entirely precluded from proceeding in the subsequent action against the medical malpractice defendants, since the plaintiff already accepted a settlement covering those injuries.

In setting forth an orderly method for such a hearing, Judge Meyer noted the following:

"At the contemplated hearing, the trier of fact will first determine the amount paid to plaintiffs in settlement by the original tortfeasors, which may or may not be the amount recited in the release.... Third, the fact finder should determine what portion, if any, of the settlement payment should be attributed to each plaintiff's aggravation damages. In so doing, he will consider the statement as to allocation, if any, between original and aggravated injuries contained in the settlement documents and the gravity of the respective injuries and determine whether the amount allocated by the parties was arrived at in good faith. Finally, as to either plaintiff if the *fact finder allocates any portion of the settlement payment to the aggravation injuries, he should deduct that portion from the damages awarded that plaintiff and direct that judgment be entered for the difference*" (emphasis supplied).

With these principles in mind, the Court now turns to the evidence presented at the hearing.

## THE HEARING

JOAN GOODMAN is a Senior Claims Adjuster with the Hanover Insurance Co. ("Hanover"), which carrier insured Richard Treulieb, the operator of the motor vehicle involved in the original accident. The coverage was $250,000 for a single plaintiff. Ms. Goodman is involved in the handling of "big cases." Ms. Goodman participated in the settlement negotiations culminating in the payment of the full amount of the policy, the sum of $250,000, on January 11, 1989. On direct examination, she was asked whether any portion of the $250,000 was based on a claim of paralysis. Her answer was "No." However, when asked what injuries she considered with regard to the settlement, she included "weakness in the extremities and unable to walk."

On cross-examination, Ms. Goodman testified that the plaintiff was suffering from "weakness ... in his extremities and was unable to walk." She stated that the Hanover Insurance Co. claims people knew that the plaintiff was unable to walk and that was a significant factor in settling the case.

Apparently, the injuries were so serious that Hanover did not even retain a neurologist to examine the plaintiff. They relied upon the hospital records, the "no-fault" medical report and an examination by a "rehabilitation nurse" retained by Hanover to examine the plaintiff.

Ms. Goodman did use the North Shore Hospital record in order to evaluate the plaintiff's claim, which included the following statements in the Discharge Note:

"The patient was hemodynamically stable and was taken back to the OR and underwent a resection and repair of the thoracic artery on 9/19/88. The patient did well postop but did sustain paraparesis of the lower extremities and then having a neurogenic bladder. The patient remained catheterized and was worked up by CAT scan and Neurology and it was felt that there was anterior

cord ischemia and subsequent paraparesis.

. . . . .

Urodynamics for the evolving neurogenic bladder was given and subsequently the patient was instructed on self instrumentation, on straight catheterization. He remained clinically stable.

. . . . .

. . . the patient was discharged on 10/20/88 and transferred to Rusk Rehabilitation Center."

Ms. Goodman further stated that "part of her thinking in settling was that the plaintiff was unable to walk." It is unrealistic and illogical to believe that the paraparesis and inability to walk would not be the most serious part of the plaintiff's injuries. In fact, Ms. Goodman stated that Laurence Bernstein, the plaintiff's attorney, told her "Mr. Moller will only be able to walk with crutches."

If there was any doubt as to whether the paralysis and inability to walk—which are the injuries allegedly caused by the aggravation by Dr. Levine and the hospital—were contemplated within the $250,000 Hanover settlement, it is resolved in the letter from Laurence Bernstein, Esq. to Ms. Goodman, dated December 22, 1988 (Defendants' Exh. D), which reads as follows:

"Dear Ms. Goodman:

Further to our telephone conversation of this day, enclosed please find the medical report of Dr. Horacio D. Pineda with respect to our above client.

The enclosed report clearly confirms the seriousness of the injuries sustained by our client on September 18, 1988. In addition to the multiple surgical procedures performed, he is presently neurogenic and will at best, walk only with the assistance of crutches.

In view of the liability aspect of this case, it is in our opinion that this case has a value in excess of your liability policy of $250,000.00. Demand is hereby made upon you to settle this matter for the above policy amount.

In the event this matter is not resolved, it is our intention at the time of trial to proceed against your company on a bad faith basis. I would appreciate your contacting me after you have had an opportunity to review the enclosed."

The fact that Hanover, via Ms. Goodman, considered and evaluated the paralysis and inability to walk is fortified by her testimony on redirect examination that someone told her that "plaintiff could not walk but it was thought he would walk again—there was an 80 to 100% chance he would walk again." Ms. Goodman expressly stated that she considered this walking disability. Even if she would have recommended the payment of the entire $250,000 based on the original injuries, there is no doubt that Hanover considered and included the paralysis and walking disability and the neurogenic bladder, in its decision to pay the full amount of the policy.

STANLEY JANOFF is and has been a claims examiner and "court man" for Public Service Mutual Insurance Co. ("Public Service"). He is involved in negotiating "big cases." Leonard Winkler of his company was present in court at the settlement of the action in Supreme Court, Queens County. Janoff did not personally negotiate this case but he is familiar with the case and reviewed the entire file. Public Service insured Squire Catering for liquor law liability up to a maximum of $500,000.

In addition to other considerations, there was some dispute as to coverage in that the policy covered only "on premises" liquor consumption and this case involved a party "off" the restaurant premises and a reservation of rights letter was sent to Squire.

There were settlement negotiations only during the damages portion of the bifurcated trial. Notwithstanding the coverage problem, Public Service decided to pay $475,000 out of its $500,000 total coverage. In fact, Janoff testified that its court negotiators were authorized to pay the entire $500,000, if necessary.

Janoff testified that the injuries were so serious that a decision was made to "throw in" the policy so as to avoid possible exposure to the assured.

Considering the fact that the plaintiff was in a wheelchair and partially paralyzed, Janoff estimated a possible jury verdict of four to five million. Also, even without the paralysis, he estimated a verdict of a "few" million dollars.

The verified bill of particulars included claims of paralysis, neurogenic damage and inability to walk. Significantly, Janoff unequivocally testified that Public Service took into consideration the paralysis injury and that the plaintiff was in a wheelchair in court during the trial. He stated this several times during his testimony. How could a reasonably prudent and experienced carrier claims adjuster not give paramount, major and controlling consideration to a condition of paralysis and inability to walk?

In addition, the parties stipulated that Dr. Nathanial Shafer testified "that the paralysis was a permanent condition caused by the automobile accident."

Further, Public Service received medical reports from orthopedic surgeons and neurological surgeons, which it took into consideration in evaluating and settling this claim. Among the medical reports is one from Dr. Ralph A. Olson, a neurological surgeon retained by Chubb & Son and sent to Public Service, dated June 13, 1989, with regard to an examination of the plaintiff on the same date, which reads, in part, as follows:

"As a consequence of his injuries he is paralyzed from the waist down and is required to utilize a wheelchair. Occasionally, he uses long leg braces with a walker. He complains of pains in his chest and difficulty in breathing.

.    .    .    .    .

IMPRESSION: The patient at this time presents with marked paraparesis of both lower extremities with a neurogenic bladder. Bowel control appears adequate. At the time of his injury he sustained a thoracic aortic tear with interruption of blood supply to the spinal cord, namely the anterior spinal artery, which resulted in an infarction involving the anterior portion of the spinal cord. *The patient's condition is, in all proba-*

*bility, permanent in nature,* however I would recommend that he be further evaluated in approximately 6 to 9 months to determine what improvement if any, has occurred" (Defendant's Exh. G) (emphasis supplied).

Dr. Murray E. Burton, an orthopedic surgeon, examined the plaintiff on behalf of a carrier on June 14, 1989, and reported as follows:

"*OPINION:*

In my opinion based upon the information as given, this patient sustained ... a resultant paraplegia, most probably the result of an infarction of the anterior portion of his spinal cord secondary to injury to the anterior spinal arteries.

The patient at the present time has a poor prognosis as far as motor power recovery is concerned, and he is in need of further care in the form of rehabilitation therapy in an effort to make him more independent. It is possible in a patient of this type to make him ambulatory utilizing Canadian crutches and two long leg braces, but this will require extended therapy.

*The patient's orthopaedic injuries have been submerged into the whole, and the problem now is that of treating a paraplegia with the attendant needs and devices required*" (emphasis supplied) (Defendant's Exh. I).

It is significant that the medical reports focus in on the permanency of the paralysis and the inability to walk and do not concern any other type of permanency, such as from the original injuries.

Further, in the "Initial Loss Report" of Public Service Mutual, required to be filed, dated February 3, 1989, it is reported that the plaintiff sustained "paraplegia, (and) neurogenic bladder and bowel ... and he is still a patient at the Rusk Institute of Rehabilitative Medicine" (Defendant's Exh. J).

Significantly, the Court questioned Janoff and he answered, candidly, as to the paraplegia, as follows:

"THE COURT: In your experience with reasonable adjusting certainty, would your company have taken into con-

sideration both Dr. Friedman's report and Dr. Shafer's testimony, or only one or in what extent?

THE WITNESS: We would have taken into consideration both reports, your Honor. But the bottom line here was that this case was settled on the basis of a verdict against us, and on the basis of what our trial attorney told us, your Honor, *and also on the basis of the young man being in a wheelchair at the time of trial.*

Q Would it be fair to say that based upon your experience in the industry that the issue tried at the damages case was the severity and the basis of the claim of paraparesis?

MS. CORNACCHIO: Objection.

THE COURT: After reviewing the file if you can answer that I will allow it. Overruled.

A Yes, I would agree" (emphasis supplied).

### ADDITIONAL FINDINGS OF FACT

1. The plaintiff's claim of aggravation is that, as a direct result of the defendants' failure to properly diagnose the laceration of the plaintiff's thoracic aorta, the defendants aggravated his injuries and he was directly caused to sustain paraparesis of the lower extremities, a neurogenic bladder, and an inability to walk.

2. The plaintiff failed to prove, by a preponderance of the credible evidence, that the initial $250,000 settlement with the state court defendant Treulieb did not contemplate, cover and include these same aggravation injuries, namely, the paraparesis of the lower extremities, the neurogenic bladder, and the inability to walk.

3. In fact, the Court finds that Hanover Insurance Company did contemplate, consider and purport to include all of those injuries in its $250,000 settlement with the plaintiff.

4. The Court finds that the plaintiff failed to prove, by a preponderance of the credible evidence, that the second settlement of $475,000 with the state court defendant Squire Catering did not contemplate, cover and include these same aggravation injuries, namely, the paraparesis of the lower extremities, the neurogenic bladder, and the inability to walk.

5. In fact, the Court finds that Public Service Mutual Insurance Company did contemplate, consider and purport to include all of those injuries in its $475,000 settlement with the plaintiff.

It is this type of piecemeal litigation that confuses and intertwines the original and aggravating injuries between original and successive tortfeasors that *Hill* was designed to clarify.

The plaintiff's attorneys in this case had two cracks at the bat prior to this case, and in each of the two prior settlements, they fully used the plaintiff's paralysis, inability to walk and neurogenic injuries to obtain the maximum possible settlements.

### CONCLUSIONS

The plaintiff's attorneys and the Hanover Insurance Company intended to include the aggravation of the plaintiff's injuries, as set forth in the amended complaint, including the paraparesis of the lower extremities, a neurogenic bladder and the inability to walk in the settlement of $250,000 consummated on January 11, 1989.

The plaintiff's attorneys and the Public Service Mutual Insurance Company intended to include the aggravation of the plaintiff's injuries, as set forth in the amended complaint, including the paraparesis of the lower extremities, a neurogenic bladder and the inability to walk, in the settlement of $475,000 consummated on April 24, 1990 in Supreme Court, Queens County.

Accordingly, the motion by both defendants North Shore University Hospital and Dr. David Levine, for summary judgment on the ground that the prior two settlements in the state court action were intended to constitute a satisfaction of all damages in this case, is granted, and the complaint is dismissed in its entirety.

SO ORDERED.