*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  July 17, 2014                    517650
_____

ANN PAULA FRIEDLAND, as
    Administrator of the Estate
    of JACK FRIEDLAND, Deceased,
                    Respondent,
        v                                    MEMORANDUM AND ORDER

VASSAR BROTHERS MEDICAL
    CENTER,
                    Appellant.
_____

Calendar Date:  June 3, 2014

Before:  Peters, P.J., Garry, Rose, Egan Jr. and Clark, JJ.

_____

        Phelan Phelan & Danek, LLP, Albany (Stanley J. Tartaglia
Jr. of counsel), for appellant.

        Goldstein & Goldstein, LLP, Poughkeepsie (Paul J. Goldstein
of counsel), for respondent.

_____

Peters, P.J.

        Appeal from an order of the Supreme Court (Gilpatric, J.),
entered April 23, 2013 in Ulster County, which denied defendant's
motion for summary judgment dismissing the complaint.

        This medical malpractice action arises out of the death of
plaintiff's husband, Jack Friedland (hereinafter decedent), at
defendant's hospital.  On the morning of May 6, 2007, decedent
woke plaintiff shivering uncontrollably and complaining of pain
in his lower back.  Plaintiff called for an ambulance and
requested that decedent be taken to defendant's emergency room.
Upon arrival, decedent came under the care of emergency room

medical director Craig van Roekens.  Believing decedent to be experiencing a heart attack, van Roekens immediately activated defendant's cardiac catheterization team.  Van Roekens then contacted cardiac interventionalist Zubair Jafar and cardiologist Gary Nathanson.  Nathanson examined decedent briefly in the catheterization lab as Jafar and his team prepared for the procedure.  Jafar successfully cleared an occlusion in decedent's right coronary artery, but decedent continued to exhibit signs of distress.  After conferring with Jafar, Nathanson contacted intensivist Michael Dempsey, who admitted decedent to the intensive care unit (hereinafter ICU).  Dempsey, whose differential diagnosis included sepsis and a possible perforated bowel, ordered various tests, including a CT scan of decedent's abdomen.  The CT scan, once completed, revealed a likely perforation in decedent's intestinal tract.  More than 15 hours after decedent first arrived at the hospital, surgeon Rubin Delgado began an emergency laparotomy — a surgical exploration of decedent's abdominal cavity — in the hopes of locating and repairing the perforation.  The surgery lasted four hours. Decedent succumbed to severe septic shock several hours later.

Plaintiff subsequently commenced this action alleging, among other things, that van Roekens, Nathanson, Dempsey and others failed to timely order, perform and read the abdominal CT scan, which prevented the prompt diagnosis of decedent's abdominal puncture as the source of his sepsis and ultimately led to his death.  Following joinder of issue and discovery, defendant moved for summary judgment dismissing the complaint. Supreme Court denied the motion, and this appeal ensued.

Under settled law, a hospital ordinarily may not be held liable for the negligent acts of treating physicians who are not hospital employees (see Hill v St. Clare's Hosp., 67 NY2d 72, 79 [1986]; Brink v Muller, 86 AD3d 894, 895-896 [2011]; Thurman v United Health Servs. Hosps., Inc., 39 AD3d 934, 935 [2007], lv denied 9 NY3d 807 [2007]).  Vicarious liability for malpractice on the part of nonemployee physicians may be imposed, however, on a theory of ostensible or apparent agency (see Hill v St. Clare's Hosp., 67 NY2d at 79; St. Andrews v Scalia, 51 AD3d 1260, 1261-1262 [2008]; Monostori v Murphy, 34 AD3d 882, 883 [2006]). "'Essential to the creation of apparent authority are words or

conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority' to act on behalf of the principal" (Searle v Cayuga Med. Ctr. at Ithaca, 28 AD3d 834, 836 [2006], quoting Hallock v State of New York, 64 NY2d 224, 231 [1984]; see St. Andrews v Scalia, 51 AD3d at 1261-1262; Thurman v United Health Servs. Hosps., Inc., 39 AD3d at 935-936; King v Mitchell, 31 AD3d 958, 960 [2006]). Consequently, "a hospital may [face vicarious liability] for the acts of independent physicians if the patient enters the hospital through the emergency room and seeks treatment from the hospital, not from a particular physician" (Citron v Northern Dutchess Hosp., 198 AD2d 618, 620 [1993], lv denied 83 NY2d 753 [1994]; accord St. Andrews v Scalia, 51 AD3d at 1262; see Brink v Muller, 86 AD3d at 896).

Here, none of decedent's treating physicians were hospital employees. Thus, as the proponent of the motion for summary judgment, defendant bore the initial burden of establishing that decedent sought care from a specific physician rather than from defendant generally (see St. Andrews v Scalia, 51 AD3d at 1262; Payant v Imobersteg, 256 AD2d 702, 703-704 [1998]). In support, defendant argues primarily that decedent's care was assumed and directed by Nathanson, an employee of decedent's primary care group, and thus that decedent could not reasonably have believed his treating physicians were acting on defendant's behalf. Defendant's own submissions, however, belie this claim. Decedent arrived at defendant's emergency room shortly after 8:30 a.m. After taking initial steps to stabilize decedent, van Roekens activated the cardiac catheterization team, contacted Jafar and Nathanson and transferred decedent to the catheterization lab for further treatment. Nathanson testified that he had encountered decedent for the first time in the catheterization lab immediately prior to the catheterization procedure. While Nathanson testified that he had told decedent he was employed by decedent's primary care group, the record as a whole establishes that Nathanson's role in decedent's course of treatment was limited. It was van Roekens, not Nathanson, who activated the catheterization team and contacted cardiac interventionalist Jafar. Defendant's records indicate that Jafar, not Nathanson, was decedent's admitting physician, and that it was Jafar who stented decedent's occluded coronary artery. Although Nathanson,

"hoping to be helpful," attempted to obtain decedent's consent to the catheterization, the record indicates that decedent told Nathanson to "go ask [plaintiff]."

Plaintiff ultimately signed a consent form – on defendant's letterhead (see Monostori v Murphy, 34 AD3d at 883; Torns v Samaritan Hosp., 305 AD2d 965, 967 [2003]) – authorizing Jafar, not Nathanson, to perform the catheterization. Nathanson further testified that he had conferred with Jafar after the catheterization procedure, and that he and Jafar agreed, in light of decedent's deteriorating condition, to transfer him to the ICU. Notably, Nathanson testified that he had no further contact with decedent after delivering him into Dempsey's care, and that it was Dempsey who admitted decedent to the ICU. Nothing in the record indicates that Nathanson ordered or performed tests during decedent's hospitalization or otherwise assumed responsibility for his care (compare Thurman v United Health Servs. Hosps., Inc., 39 AD3d at 936-937). In light of the foregoing, defendant failed to make out a prima facie case that decedent "could not have reasonably believed that he was receiving medical care from the hospital in general rather than from a particular physician" (Thurman v United Health Servs. Hosps., Inc., 39 AD3d at 937; see St. Andrews v Scalia, 51 AD3d at 1262-1263; Monostori v Murphy, 34 AD3d at 883; cf. Hickey v Arnot-Ogden Med. Ctr., 79 AD3d 1400, 1401-1402 [2010]; compare Schultz v Shreedhar, 66 AD3d 666, 666-667 [2009]).

Defendant argues alternatively that, irrespective of any potential vicarious liability on its part, decedent's attending physicians committed no malpractice. Again, defendant bore the initial burden of establishing that decedent's treatment fell within accepted standards of care, or that any departure from such standards was not a proximate cause of decedent's injuries (see Cole v Champlain Val. Physicians' Hosp. Med. Ctr., 116 AD3d 1283, 1285-1286 [2014]; Olinsky-Paul v Jaffe, 105 AD3d 1181, 1182 [2013]; LaFountain v Champlain Val. Physicians Hosp. Med. Ctr., 97 AD3d 1060, 1061 [2012]; Derusha v Sellig, 92 AD3d 1193, 1193 [2012]). In support of its motion, defendant submitted, among other things, the affirmation of board-certified pulmonologist and critical care physician Scott Beegle. Noting that physical examination and other test results – including an abdominal X ray

— initially suggested that decedent was not suffering from an intestinal perforation, Beegle opined that Dempsey's decision to order a non-STAT CT scan comported with the accepted standard of care. Beegle further noted that decedent's deteriorating physical condition required that he be stabilized before the scan could be performed, and that such stabilization, too, complied with the accepted standard of care. Accordingly, the burden shifted to plaintiff "to establish, through competent expert medical opinion evidence, that there exists a triable issue of fact as to whether there was a deviation from the accepted standard of care and whether there exists a causal nexus between that deviation and [decedent's] injuries" (Helfer v Chapin, 96 AD3d 1270, 1272 [2012]; see Longtemps v Olivia, 110 AD3d 1316, 1318 [2013]; Derusha v Sellig, 92 AD3d at 1194).

To this end, plaintiff submitted a responsive affirmation from board-certified surgeon Thomas Hamilton Gouge, who opined that decedent's treating physicians departed from accepted standards of care both by failing to timely diagnose decedent's intestinal perforation and by failing to timely operate to find and repair the perforation. Regarding the necessity of the CT scan itself, Gouge noted that an abdominal X ray is "not a definitive enough test" to exclude an intestinal perforation, and that an abdominal CT scan was the most efficacious diagnostic device under the circumstances — a sentiment notably echoed by Dempsey in his deposition testimony. Gouge further opined that, in light of decedent's clinical presentation upon arrival at the ICU, the applicable standard of care required that a CT scan of his abdomen be immediately performed. According to Gouge, decedent's physical condition should not have delayed performance of the scan. Gouge also affirmed that decedent was stable enough to have undergone abdominal surgery much earlier in the day, and that the unnecessary delay in identifying and repairing the intestinal perforation led to decedent's untimely demise. Viewing the evidence in a light most favorable to plaintiff, we conclude that Gouge's affirmation was sufficient to raise triable issues of fact with regard to the timeliness of the CT scan and ensuing surgical intervention (see Cole v Champlain Val. Physicians' Hosp. Med. Ctr., 116 AD3d at 1287-1288; Longtemps v Olivia, 110 AD3d at 1318; Derusha v Sellig, 92 AD3d at 1194). Accordingly, this branch of defendant's summary judgment motion

was also properly denied.

To the extent that defendant argues that plaintiff's allegations of negligence exceed those contained in her bill of particulars as amended, defendant waived this argument by failing to make it before Supreme Court (see CPLR 5501 [a] [3]; Congleton v United Health Servs. Hosps., 67 AD3d 1148, 1149-1150 [2009]; Goodspeed v Adirondack Med. Ctr., 43 AD3d 597, 598 [2007]). In any event, plaintiff's second amended bill of particulars provided defendant adequate notice of her theory of negligence (see CPLR 3043 [a] [3]; Citron v Northern Dutchess Hosp., 198 AD2d at 619; see also Hudson v Lansingburgh Cent. School Dist., 27 AD3d 1027, 1029 [2006]; compare Suits v Wyckoff Hgts. Med. Ctr., 84 AD3d 487, 489 [2011]).

Garry, Rose, Egan Jr. and Clark, JJ., concur.


ORDERED that the order is affirmed, with costs.




ENTER:


Robert D. Mayberger
Clerk of the Court